STATE

v.

**Rocco D'ALESSIO.**

No. 2002–701–C.A.

Supreme Court of Rhode Island.

April 1, 2004.

Jane M. McSoley, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

The first day that Jennifer Greenhalgh (Ms. Greenhalgh) returned to work as a new mother was the last day of her daughter's life. A Superior Court jury found Ms. Greenhalgh's then-boyfriend, Rocco D'Alessio (defendant), guilty of the second-degree murder of the couple's three-month-old daughter, Gianna Lynn D'Alessio (Gianna). Appealing his conviction, the defendant argues that the chief medical examiner of the State of Rhode Island, Elizabeth Laposata, M.D. (Dr. Laposata), was unqualified to offer her expert opinion that the cause of Gianna's death was shaken-baby syndrome. The defendant also alleges that the trial justice denied him his constitutional right of confrontation because he was precluded from cross-examining Ms. Greenhalgh about her drug use since Gianna's death and at the time of trial. Finally, according to the defendant, the trial justice erred by denying his motion for a new trial on the grounds that the verdict was against the weight of the evidence and failed to do substantial justice. All of the defendant's arguments are without merit and, therefore, the judgment of conviction is affirmed.

## I

### Facts and Travel

Gianna was born to defendant and Ms. Greenhalgh on October 5, 1999. Approximately a month and a half later, the couple began living together in a third-story apartment at 49 Hillhurst Avenue in the City of Providence. In January 2000, Ms. Greenhalgh decided that she would return to her old restaurant job. Her first day of work was January 13, which Ms. Greenhalgh testified was the first snowstorm of the year. Uncomfortable driving with Gianna in the snowy conditions, Ms. Green-

halgh canceled a scheduled pediatrician's appointment and made arrangements for defendant to watch Gianna at home that evening so she could avoid driving to the home of defendant's stepmother, who had originally planned to baby-sit. The defendant agreed that he would return home from work by 3:30 p.m. so Ms. Greenhalgh could report to work in time for her 4 p.m. shift. That was to be defendant's first time watching Gianna alone for an extended period.

The defendant, after stopping at a friend's house on the way, returned home sometime between 3:35 and 3:40 p.m. Upset that he was late and believing that he was cheating on her, Ms. Greenhalgh started an argument with defendant. The argument escalated when Ms. Greenhalgh informed defendant that she had hidden his stash of cocaine so he could not use drugs while he was watching the baby. After several minutes of arguing, Ms. Greenhalgh left the apartment and got into her car to go to work. The defendant followed her outside, where he punched the window and kicked the door of the car. Eventually, Ms. Greenhalgh got out of the car and, after arguing for another few minutes, told defendant where she had hidden the drugs. The couple talked for a few more minutes and Ms. Greenhalgh eventually went to work, leaving Gianna in defendant's care.

At approximately 5 p.m., Lieutenant Alan Fortes of the Providence Fire Department (Lt.Fortes),[1] received the first of what would be two emergency calls that evening relating to Gianna. He was told that a child was having difficulty breathing at 44 Hillhurst Ave, the home of defendant's neighbor. When Lt. Fortes and other rescue personnel arrived, defendant was holding a sleeping Gianna and nervously stated that she was not breathing

or acting right. Gianna woke up when Lt. Fortes took her from defendant to assess her. A brief examination revealed that Gianna was not in respiratory distress. The defendant then called Ms. Greenhalgh at work and, after speaking with her shortly, he gave the phone to Lt. Fortes. Lieutenant Fortes explained that they were just doing an initial assessment on Gianna and that they would call her back if necessary. After defendant refused Lt. Fortes's three offers to take Gianna to the hospital, Lt. Fortes and the other rescue personnel left the scene, confident that although Gianna may have been constipated or colicky, she was otherwise healthy.

Lieutenant Fortes received the second emergency call at approximately 8 p.m. This time, the report was that a child was unresponsive and CPR was being administered at 49 Hillhurst Ave., the home of defendant, Ms. Greenhalgh and Gianna. Lieutenant Fortes and other rescue personnel arrived within three minutes. As they ran around the back of the house, they saw defendant holding Gianna by the chest, exclaiming that she was not breathing. Upon seeing Gianna's face, Lt. Fortes knew immediately that she was in cardiac arrest and began rescue breathing. Gianna was put into the ambulance where rescue personnel began advanced cardiac life support as they drove to Hasbro Children's Hospital in Providence (Hasbro). During the three-or-four minute trip to Hasbro, defendant repeatedly asked "What did I do? Did I do something wrong?" Gianna was pronounced dead soon after her arrival at Hasbro.

A Superior Court jury trial began on April 10, 2002. The state first called Ms. Greenhalgh to testify. She described the birth of Gianna and her relationship with defendant leading up to Gianna's death.

1. Lieutenant Fortes has since been promoted to acting captain of Rescue Company 3.

Ms. Greenhalgh admitted she had used cocaine in the past, but that she indulged less frequently than defendant and not at all on the day Gianna died. She then described the events of January 13, including her arguments with defendant and the worrying phone calls she received at work that day. On recross-examination, defense counsel attempted to explore the issue of Ms. Greenhalgh's admitted drug use. The trial justice stopped the line of questioning when defense counsel asked Ms. Greenhalgh whether she was presently undergoing drug treatment. At sidebar, defense counsel said that he believed Ms. Greenhalgh may have been suffering from adverse withdrawal symptoms, or under the influence of controlled substances as she testified. The trial justice, however, limited cross-examination on the subject for lack of foundation and relevance.

The state then called Dr. Laposata to offer her expert medical opinion that Gianna died of shaken-baby syndrome. The defendant objected to her testimony, arguing that Dr. Laposata was not a qualified expert because she was not a specialist in the field of neuropathology. The trial justice, however, qualified Dr. Laposata as an expert and she went on to discuss her findings and conclusions with respect to Gianna's death.

Doctor Laposata stated that she did not perform the autopsy, but that she was in and out of the examination room and did make some observations during the procedure. After the autopsy, however, Dr. Laposata did examine Gianna's brain closely. Describing her findings, Dr. Laposata testified that she observed fresh blood on the surface of the brain, blood beneath the arachnoid membrane in the brain and hemorrhaging around the optic nerve. She explained that these injuries are the result of repeated, forceful acceleration and deceleration of the brain within the skull. Doctor Laposata went on to explain that, because the brain floats in liquid in the skull, when a baby is violently shaken, the brain rotates within and bounces off the skull, tearing blood vessels "between the brain and the dura, causing subdural hemmorhage [sic]" and brain injury. These injuries, Dr. Laposata described, cause death within minutes of their infliction. Ultimately, Dr. Laposata testified, the combination of injuries to Gianna's brain are the "classic" constellation of injuries "in cases of shaken-baby syndrome." Doctor Laposata confirmed her findings with a neuropathologist, who also examined Gianna's brain.

At the close of all evidence, the jury found defendant guilty of second-degree murder. The trial justice denied defendant's motion for new trial and sentenced him to sixty years imprisonment, forty to serve. The defendant timely appealed.

## II

### Expert Testimony

■ According to defendant, Dr. Laposata was not qualified to offer an expert opinion that the cause of Gianna's death was shaken-baby syndrome. Specifically, he argues that Dr. Laposata was unqualified because she was not a specialist in the field of neuropathology and had limited experience with shaken-baby syndrome. We, however, perceive no error in the trial justice's decision to qualify Dr. Laposata as an expert capable of offering her opinion about Gianna's cause of death.

■ Rule 702 of the Rhode Island Rules of Evidence governs the admission of expert testimony. That rule provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of fact or opinion."

It is well settled that the "determination of admissibility of opinion evidence and qualifying expert witnesses rest 'in the sound discretion of the trial justice and will not be disturbed absent a showing of an abuse of that discretion.'" *State v. Gough*, 810 A.2d 783, 785 (R.I.2002) (quoting *Graff v. Motta*, 748 A.2d 249, 252 (R.I.2000)).

■ In determining whether a witness is qualified to testify as an expert, "[p]rime considerations * * * include evidence of the witness's education, training, employment, or prior experiences." *State v. Villani*, 491 A.2d 976, 979 (R.I.1985). Rule 702 does not require that a proffered expert have a formal certification or specialization in a particular field. *See Leahey v. State*, 121 R.I. 200, 202, 397 A.2d 509, 510 (1979). In *Leahey*, we held that a general surgeon could offer his expert opinion that there was no causal relationship between an individual's injuries and his work-related duties. *Id.* As we explained, "[t]he fact that [the surgeon] is not a specialist in the orthopedic field might bear upon the weight given to his testimony, but does not affect the admissibility of his testimony." *Id.*

This Court has held that forensic pathologists and medical examiners, by virtue of their education and experience, are qualified to offer their opinions on a wide range of topics relating to cause of death. In *Villani*, 491 A.2d at 978–79, we concluded that a former chief medical examiner for the state was qualified to express his opinion that a person had died of multiple gunshot wounds. In *State v. Morales*, 621 A.2d 1247, 1249 (R.I.1993), we held that a forensic pathologist was qualified to testify about the distance between a shooter and a victim because "he had attended firearms seminars on this subject and had on prior occasions examined wounds for fouling or stippling." Along those same lines, this Court has held that Dr. Laposata in particular, despite the fact that she was not an expert in ballistics, was qualified to offer her opinion about how a bullet that was lodged in a victim's leg became deformed. *State v. Rieger*, 763 A.2d 997, 1004–05 (R.I.2001).

As a medical doctor, trained and certified in anatomic and forensic pathology, Dr. Laposata was sufficiently trained and educated to offer her opinion about Gianna's cause of death. Doctor Laposata received her medical degree from the University of Maryland. Thereafter, she studied anatomic pathology at Johns Hopkins Hospital and forensic pathology at St. Louis University in St. Louis, Missouri. Forensic pathology, Dr. Laposata described, "is the study of the body to understand what happens to the body and cause death. * * * It's also the study of injuries and how injuries cause death."

Doctor Laposata's employment and previous experiences also support the trial justice's decision to qualify her as an expert. At the time of defendant's trial, Dr. Laposata had been the chief medical examiner for the State of Rhode Island for six years. Before that, she had worked as an assistant medical examiner for the cities of St. Louis and Philadelphia, and the State of Delaware. Doctor Laposata stated that, over her career, she had performed "thousands of post-mortem exams." On previous occasions, Dr. Laposata had been involved in autopsies in which shaken-baby syndrome was identified to be the cause of death. She had also read articles in medical journals discussing shaken-baby syndrome, spoken with others about the subject and gained additional knowledge about shaken-baby syndrome at meetings. Doctor Laposata's diagnosis of shaken-baby syndrome in this case was based on "clas-

sic findings that [she knows] very well, inside and out. They speak for themselves * * *." Clearly, Dr. Laposata had sufficient "education, training, employment, or prior experiences" to offer her opinion that Gianna died of shaken-baby syndrome. *Villani*, 491 A.2d at 979.

The fact that Dr. Laposata was not a certified expert in neuropathology did not render her unqualified to offer her expert opinion in this case. Although not an expert in the field, Dr. Laposata testified that she studied and understood neuropathology. Further, she explained that a neuropathologist's opinion was not necessary to make her diagnosis and that her meeting with the neuropathologist in this case merely confirmed her conclusion. Despite the fact that Dr. Laposata was not a certified neuropathologist, she was certain that Gianna's brain injuries were caused by violent shaking. Thus, as we concluded in *Leahey*, the fact that Dr. Laposata was not a specialist in neuropathology might bear on the weight of her testimony, but not its admissibility. *Leahey*, 121 R.I. at 202, 397 A.2d at 510.

Moreover, defendant presented no expert testimony to rebut Dr. Laposata's opinion about the cause of Gianna's death. Other than an unsuccessful attempt at cross-examination, Dr. Laposata's testimony was not contradicted. The trial justice committed no error by allowing the jury to hear her expert opinion.

## III

### Right of Confrontation

■ The defendant next argues that the trial justice deprived him of his constitutional rights of confrontation by denying him the opportunity to cross-examine Ms. Greenhalgh on the issue of her supposed drug use since the day of Gianna's death and on the day she testified. When at-

tempting to justify his line of questioning, defense counsel said that he believed Ms. Greenhalgh may have been under the influence of drugs or suffering from symptoms of withdrawal that left "her in a state of mind where she's having difficulty answering questions * * *." The trial justice disagreed with defense counsel's suggestion and stated that "to me, she's answered questions in a responsive fashion." Ultimately, the trial justice forbade the line of questioning for lack of foundation. He also concluded that Ms. Greenhalgh's purported drug use in 2002 was not relevant to what happened when Gianna was killed two years earlier.

■ The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution guarantee a defendant's right of confrontation, which includes the right to conduct effective cross-examination. *See* *State v. DePina*, 810 A.2d 768, 775–76 (R.I.2002). The right to cross-examination does not include an unfettered license to ask any question that the defendant may desire. *State v. Werner*, 831 A.2d 183, 209 (R.I.2003). A trial justice may properly act within his or her discretion to restrict unduly harassing or ·repetitive interrogation. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). This Court has stated that a trial justice may limit a "proposed line of questioning if it is not relevant to the trial issue, or if the proposed questioning, even if relevant, is outweighed by any of the reasons prescribed in Rule 403 of the Rhode Island Rules of Evidence." *State v. Oliveira*, 730 A.2d 20, 24 (R.I.1999).

■ Generally, "[e]vidence of intoxication is admissible for the purpose of attacking the credibility of a witness and to test his competency, his ability to perceive and remember and to communicate the subject matter of his testimony."

*State v. Ahmadjian,* 438 A.2d 1070, 1088 (R.I.1981). A witness's intoxication while testifying strikes at the very core of his or her credibility and the reliability of the testimony. Alcohol and drugs may directly implicate the person's ability to recall the events to which he or she testifies. *See Wilson v. United States,* 232 U.S. 563, 567–68, 34 S.Ct. 347, 58 L.Ed. 728 (1914); 81 Am.Jur.2d *Witnesses* § 872 at 717 (1992) (noting that a present lack of sobriety "tends to discredit [a witness's] testimony because it involves a diminution of his trustworthiness in respect to his present ability to recollect and communicate"). Beyond that, intoxication at the time of testifying could also detract from a witness's ability to appreciate his or her sworn obligation to tell the truth. Thus, current intoxication is a potent, and relevant, topic for cross-examination. *See United States v. Banks,* 520 F.2d 627, 631 (7th Cir.1975). Drug addiction and treatment in general, however, are improper topics for cross-examination "without also showing how that specific information would affect [the witness's] credibility." *Commonwealth v. Adrey,* 376 Mass. 747, 383 N.E.2d 1110, 1112 (1978).

■ In any event, drug use and addiction are topics that should be handled with sensitivity to avoid undue and unnecessary prejudice. *United States v. Kearney,* 420 F.2d 170, 174 (D.C.Cir.1969); *see also United States v. Kizer,* 569 F.2d 504, 506 (9th Cir.1978). "Prejudice may result if questions asked for the limited purpose of testing, say, opportunity to observe, are permitted to generate a hostility based on the general odium of narcotics use." *Kearney,* 420 F.2d at 174. Thus, before a defendant may question a witness about his or her present drug use, the cross-examiner must establish a proper foundation "through, for example, a showing of reasonably contemporaneous drug use."

*Banks,* 520 F.2d at 631. In *Kizer,* the court affirmed a trial justice's limitation of cross-examination on the subject of drug use because the witness was "reasonably lucid" and the defendant failed to establish the requisite foundation. *Kizer,* 569 F.2d at 506.

In this case, there was no evidence of Ms. Greenhalgh's "reasonably contemporaneous drug use." *Banks,* 520 F.2d at 631. After reviewing her testimony, we agree with the trial justice that, like the witness in *Kizer,* Ms. Greenhalgh's responses to the questions posed to her by the prosecution and defendant did not indicate that she was intoxicated while testifying. Further, although Ms. Greenhalgh admitted using drugs in the past and the state conceded that she "has had" a substance abuse problem, there is no indication that she was suffering from adverse withdrawal symptoms that could detract from her credibility. Thus, defendant has failed to demonstrate that drugs, or the lack thereof, had an effect on Ms. Greenhalgh's ability to perceive, remember or describe accurately the events of January 13, 2002. *See Ahmadjian,* 438 A.2d at 1088. Given the lack of foundation offered by defendant, the trial justice properly limited the scope of cross-examination as he did.

■ Moreover, any error in refusing to allow defense counsel to pursue this line of questioning would be harmless. The improper denial of an opportunity to cross-examine a witness on a particular matter " 'does not fall into the category of constitutional errors that are automatically deemed prejudicial.' * * * If the error is harmless beyond a reasonable doubt, the conviction need not be set aside." *State v. Fillion,* 785 A.2d 536, 539 (R.I.2001) (quoting *State v. Canning,* 541 A.2d 457, 461 (R.I.1988)). In determining whether an erroneous limitation on cross-examination is harmless, this Court considers: "(1) the

importance of the witness's testimony to the prosecution's case; (2) 'whether the testimony was cumulative'; (3) the presence or absence of corroborating or contradictory evidence; (4) 'the extent of cross-examination otherwise permitted'; and (5) 'the overall strength of the prosecution's case.' " *Id.* (quoting *State v. Bustamante,* 756 A.2d 758, 766 (R.I.2000)).

Although Ms. Greenhalgh's testimony represented a significant portion of the prosecution's case, the damning evidence against defendant was the undisputed fact that he was the only person with Gianna when the lethal injuries were inflicted. Thus, even if the jury entirely discredited Ms. Greenhalgh, the overall strength of the evidence was sufficient to convict defendant of second-degree murder. As such, any prejudice that may have resulted from the trial justice's decision to limit defendant's cross-examination of Ms. Greenhalgh on this subject was harmless.

## IV

### Motion For New Trial

▆▆▆▆▆ This Court will affirm a trial justice's ruling on a motion for new trial unless it is "clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence." *State v. Jackson,* 752 A.2d 5, 12 (R.I.2000) (quoting *State v. Doctor,* 690 A.2d 321, 329 (R.I.1997)). When considering whether to grant or deny the motion, a trial justice acts as "a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *Id.* at 11 (quoting *State v. Banach,* 648 A.2d 1363, 1367 (R.I. 1994)). In carrying out that duty, "the trial justice must first consider the evidence in light of the charge to the jury, then determine his or her own opinion of the evidence, and, finally, determine whether he or she would have reached a different result than that of the jury." *State v. Dyer,* 813 A.2d 71, 75 (R.I.2003). A new trial is not appropriate if the trial justice agrees with the jury's verdict or if reasonable minds could differ as to the outcome. *Id.* On the other hand, a trial justice may grant a new trial if (1) he or she disagrees with the jury's verdict and (2) "the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Id.*

The trial justice followed all required procedures and properly carried out his duties in denying the defendant's motion for new trial. Reviewing the evidence before the court, the trial justice praised Dr. Laposata's qualifications and testimony and went on to note that the defendant's attempts to cross-examine her were "fruitless and futile." He also reviewed the evidence in light of his charge to the jury and concluded that Gianna's injuries "unquestionably were inflicted with malice." We are of the opinion that the trial justice not only was correct in denying the defendant's motion for new trial, but also that he was required to do so under the circumstances.

### Conclusion

For the reasons stated herein, we affirm the judgment of conviction. The papers of the case shall be remanded to the Superior Court.