Linda J. FRANCO et al.

v.

Joseph A. LATINA, M.D.

No. 2006–146–Appeal.

Supreme Court of Rhode Island.

March 5, 2007.

Mark B. Decof, Providence, for Plaintiff.

Michael G. Sarli, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Linda J. Franco (Franco or plaintiff) felt some serious pain in her stomach on Super Bowl Sunday of 1996, and it wasn't because she couldn't bear watching the Dallas Cowboys win another championship.[1]

A trip to her physician led to a diagnosis that she was suffering from gallstones and that her gallbladder would have to be removed. She selected Joseph A. Latina, M.D. (Dr. Latina or defendant) to perform the surgery. Unfortunately, what Franco thought would be a simple procedure that would not even interrupt her plans for a Florida vacation later that week instead led to great pain and reconstructive surgery. Franco later discovered that during the procedure to remove her gallbladder, Dr. Latina mistakenly had removed her common bile duct rather than her cystic duct. She filed a medical malpractice suit against Dr. Latina, and, two trials and one appeal to this Court later, the second trial justice took the decision on liability out of the hands of the jury and granted plaintiff's motion for judgment as a matter of law after she concluded that there was no legal basis for the jury to find in favor of defendant. The question of damages then was resubmitted to the jury, and after a verdict on damages was returned, judgment was entered for Franco. For the second time, Dr. Latina timely appealed. For the reasons stated in this opinion, and even though we appreciate the gravity of negating a jury's verdict, we affirm.

### I

### Facts and Procedural History

On two occasions in January 1996, Franco experienced pain that she described as "severe pain in my right side radiating around up into my back." She dismissed the first instance as "gas pains or something," but after a second painful episode that commenced while she watched the Super Bowl next to her sleeping husband, she began to worry that she was experiencing a more serious problem. In an

---

1. The Dallas Cowboys defeated the Pittsburgh Steelers 27–17 in Super Bowl XXX on January 28, 1996, at Sun Devil Stadium in Tempe, Arizona.

effort to discover the cause of her distress, she paid a visit to her primary care physician who scheduled her for an ultrasound.[2]

The procedure revealed that Franco did have gallstones. After it was suggested to Franco that she needed to see a surgeon, Franco sought advice from Dr. Latina, who had treated her in the past. Franco and Dr. Latina met in his office on Monday, January 29, 1996, to discuss her diagnosis. At that time, Dr. Latina informed plaintiff that she had to have her gallbladder removed,[3] news that Franco found particularly disquieting because she had planned a vacation to Florida later that same week. Doctor Latina assuaged these concerns, however, by telling her that the procedure he was going to use, laparoscopic cholecystectomy, required a very short recovery period, and that there would be no need to postpone her vacation. Calmed by the doctor's assurances, Franco decided to have the surgery immediately. The procedure went forward as planned, to all appearances a complete success, and there was no immediate indication of any difficulties or complications. Indeed, the hospital records reveal that the operation took only twenty-six minutes.

According to the testimony presented in this case, a laparoscopic cholecystectomy is a surgical procedure in which the patient is placed under general anesthesia and then four small incisions are made in the abdomen. A small camera is inserted into the abdomen through one of the incisions to project the image of the inside of the patient on two twelve-inch television screens. The patient's abdomen is then inflated with carbon dioxide to create a larger area for the surgeon to work and to improve visibility on the television screens. Using the television images to see what is happening, the doctor inserts surgical implements called trocars through the other abdominal incisions. He then identifies the cystic duct and cuts and clips it to free the gallbladder so that it can be removed. The gallbladder, no longer anchored within the patient's body, is then pulled through one of the small incisions. Finally, the incisions are closed by the doctor, sparing the patient from the normal trauma of internal surgery and leaving her with but a few small scars.

Franco was scheduled to depart for Florida post-surgery on February 2, 1997, but when that day came she did not feel up to traveling. Consequently, she and her husband delayed the start of their vacation until Sunday, February 4, 1997. The Francos were traveling by automobile,

2. An ultrasound is a procedure in which an implement called a transducer is pressed up against the body. The transducer shoots inaudible high-frequency sound waves into the body and measures the change in the waves as they bounce off the structures inside the body. From those measures, the machine can determine the size and shape of the objects that the sound waves strike, and images of those structures instantly are projected onto a screen that is attached to the transducer. The images produced by an ultrasound allow physicians to examine internal organs without having to perform an operation. *Donald F. Tapley* et al., The Columbia University College of Physicians and Surgeons Complete Home Medical Guide 67–68 (rev. ed. Crown Publishers, Inc. New York 1989).

3. The gallbladder is part of the biliary system. The biliary system also contains three ducts: the common bile duct, the common hepatic duct, and the cystic duct. This system connects the liver to the colon. The liver produces bile that is needed for digestion. The biliary system controls the flow of bile from the liver to the colon. The gallbladder serves, essentially as a holding station for bile until it is released into the colon. When the gallbladder is removed, the liver remains directly connected to the colon via the common bile duct. If this connection is severed, bile builds up in the liver, causing severe medical problems. George D. Zuidema, The Johns Hopkins Atlas of Human Functional Anatomy 133, 139 (Johns Hopkins University Press) (Baltimore 4th ed.1997).

and, on the first day of their journey, they made it to North Carolina. Throughout that day, however, Franco did not feel quite right. Also, she began to notice that her skin and eyes looked a little yellow—a condition described in medical terms as jaundice. However, she chalked it up to having recently been under anesthesia in surgery and kept traveling.

The next day, Franco and her husband made the drive the rest of the way to Sarasota, Florida, where Franco's sister lived. However, Franco felt poorly and believed that her physical condition was deteriorating,[4] so during a short stop in Jacksonville, Florida, she called Dr. Latina to ask him about her symptoms.[5] He told her that he was not sure what was wrong with her and that she should wait a couple of days to see whether the problems she was experiencing diminished. But, in the event she did not improve, he told her to seek medical attention in Florida.

Unfortunately, her condition did not improve. When Franco and her husband arrived at her sister's home in Sarasota on Monday night, she felt worse. She experienced a restless and sleepless night and did not feel well enough to leave her sister's house all day on Tuesday. By Wednesday, she was convinced that her problem was serious enough to warrant a trip to the emergency room at Sarasota Memorial Hospital.

The emergency room physicians did some initial tests in an effort to determine the cause of her jaundice. They also recommended that Franco see Douglas A. Kuperman, M.D., a local gastroenterologist. Franco did so, and explained to Dr. Kuperman that she recently had undergone a laparoscopic cholecystectomy. Doctor Kuperman performed an ultrasound, but he concluded that more tests would be needed to find out what was happening in her biliary system.

Those tests led to a diagnosis that there was a blockage in Franco's biliary system. A drain was inserted into her, which was attached to an external bag into which the excess bile produced by her system would flow. Doctor Kuperman brought another local physician, James Brock, M.D., into the case to assist him in assessing Franco's condition. Doctor Brock's review of the test results led him to conclude that during the laparoscopic cholecystectomy, part of Franco's common bile duct had been clipped and cut. Doctor Brock informed Franco that she would require major reconstructive surgery of her biliary system, and, between the two of them, they decided that she should return to Rhode Island so that Harold Wanebo, M.D., could do the surgery. As soon as Franco flew back to Rhode Island, Dr. Wanebo performed the reconstructive surgery, which was, by all accounts, successful.[6]

On May 21, 1996, Franco filed a medical malpractice complaint in the Superior Court for Providence County against Dr. Latina, alleging that he negligently performed the laparoscopic cholecystectomy and that he had failed to obtain her informed consent. A jury trial was held from October 15 to October 24, 2001. During trial, the plaintiff presented two expert witnesses, Dr. Brock and Abdool

4. In addition to general discomfort and the yellowing of her skin and eyes, Franco also noticed changes in the color of her urine and the color and composition of her stool.

5. Franco was a nurse, and based upon her professional observations and experiences began to suspect that she might have a gallstone obstructing her common bile duct. Because she was not in severe pain, however, Dr. Latina dismissed that possibility.

6. Franco continues to have regular appointments with Dr. Wanebo to ensure that no problems or complications have developed in the reconstructed biliary system.

Rahim Moossa, M.D. Both physicians testified that the standard of care for performing a laparoscopic cholecystectomy demands the correct identification of the cystic duct before any clipping and cutting occurs. The defendant, on the other hand, did not present any expert testimony. Instead, he relied on an article published by Steven M. Strasberg, M.D. in 2000. In that article, Dr. Strasberg posited that the technique Dr. Latina used to locate the cystic duct when performing Franco's laparoscopic cholecystectomy was inherently flawed.[7] The defendant argued that even though this flawed technique was within the standard of care at the time of Franco's surgery, the inherent shortcomings of the procedure caused her injury, and thus he was free from negligence.

The jury apparently accepted Dr. Latina's argument because it returned a defendant's verdict. However, the trial justice granted Franco's motion for a new trial. In her decision, the trial justice found that the testimony of both of plaintiff's experts and Dr. Latina himself revealed that the standard of care required the conclusive identification of the anatomical structures to be cut. In light of that standard of care, and the defendant's admission that he mistakenly cut the common bile duct instead of the cystic duct, the trial justice ordered a new trial.

Doctor Latina timely appealed. Before this Court, he argued that the trial justice abused her discretion by discounting the "flawed technique" theory espoused in the Strasberg article. He also contended that certain testimony elicited from Dr. Brock on cross-examination indicated that, under certain conditions—which the witness

termed hostile—the common bile duct could be cut despite the fact that the doctor operated within the standard of care. *Franco v. Latina*, 840 A.2d 1110, 1112–13, 1114 (R.I.2004) (*Franco I* ). However, we affirmed, holding that because the testimony of both plaintiff's experts and Dr. Latina was that the standard of care required conclusive, unmistakable identification of the anatomical structures before they were cut, the trial justice's grant of a new trial was correct. *Id.* at 1112, 1114. Accordingly, the case was returned to the Superior Court for a new trial.

Before the start of the second trial, plaintiff filed a motion *in limine* to prevent defendant from offering as an exhibit or referring to the Strasberg article, which formed the basis for the flawed technique defense. The trial justice[8] granted the motion *in limine* in part, ruling that competent expert testimony that performance of certain techniques satisfied the standard of care for this procedure be presented before any evidence of the "flawed technique" defense would be permitted.

The second trial commenced on February 14, 2006. Franco once again presented Drs. Brock and Moossa, who testified that the standard of care for a laparoscopic cholecystectomy required the conclusive, unmistakable identification of the anatomical structures to be cut.[9] This time, Dr. Latina offered the expert testimony of Charles Ferguson, M.D. On direct examination, Dr. Ferguson first testified that he "object[ed] to the concept of a standard of care." He then testified, when pressed to do so, that the standard of care for performing a laparoscopic cholecystectomy was "to identify the cystic duct and cystic

---

**7.** The technique that Dr. Latina testified to having used during plaintiff's surgery, and that Dr. Strasberg labeled as inherently flawed in his article, is the infundibular technique.

**8.** The trial justice for the second trial was not the same justice that presided over the first trial.

**9.** Details of the expert testimony will be provided as needed throughout this opinion.

artery, to clip and divide the cystic duct and cystic artery, dissect the gallbladder from its bed and to remove any spilled bile * * *." But, when asked his opinion about whether Dr. Latina was negligent in performing the surgery on Franco, Dr. Ferguson said, "He was not negligent," chalking up Dr. Latina's misidentification of the anatomical structures to "human error."

On cross-examination, plaintiff got Dr. Ferguson to agree that Dr. Latina had indeed misidentified plaintiff's cystic duct. After Dr. Ferguson conceded that point, Franco moved to strike Dr. Ferguson's opinion that Dr. Latina was not negligent, arguing that Dr. Ferguson's opinion on the issue of liability was not grounded in any articulated standard of care. After a sidebar conference, then a recess, then further argument outside the presence of the jury, the trial justice granted plaintiff's motion to strike the opinion testimony of Dr. Ferguson.

In response, defendant immediately moved for a mistrial, urging that the decision to strike the testimony was unduly prejudicial to defendant. However, the trial justice denied the motion for a mistrial, ruling that in light of the history of the case and her pretrial admonitions [10] defendant had been afforded fair warning of the pitfalls of asserting the "flawed technique" defense rejected by this Court in *Franco I*.

Therefore, she reasoned, striking the testimony was not unfairly prejudicial to defendant.

The trial proceeded, and, at the close of all the evidence, Franco moved for judgment as a matter of law on the issue of liability pursuant to Rule 50 of the Superior Court Rules of Civil Procedure.[11] To support her motion, Franco argued that the uncontradicted expert testimony had established that the standard of care for performing a laparoscopic cholecystectomy was to correctly and unmistakably identify the cystic duct before any cutting was done. She further pointed out that there was no question—and indeed that Dr. Latina admitted—that he had mistakenly identified plaintiff's common bile duct as her cystic duct, and that he had cut the common bile duct, causing her injury. Thus, Franco argued, there could be no question that Dr. Latina's performance fell below the standard of care and was therefore negligent. The trial justice reserved ruling on the motion and sent the case to the jury for deliberation.

After the jury (as did its predecessor in the first trial) returned a verdict in favor of defendant, the trial justice considered the motion for judgment as a matter of law that she previously had reserved. She decided that, because the opinion testimony of Dr. Ferguson on the issue of Dr.

---

10. When she issued her decision on the motion *in limine* to preclude use of the "flawed technique" defense from the Strasberg article, the trial justice said:

"[G]iven the state of the record * * *, this Court lacks the necessary foundation to allow the [Strasberg article]. * * * [T]he opinion testimony of Dr. Ferguson needs to be further explained. The foundation for it needs to be explained to the Court. * * * [M]y concern is that the evidentiary foundation for such a defense still remains lacking * * *."

11. The relevant portion of Rule 50 of the Superior Court Rules of Civil Procedure reads:

"(a) *Judgment as a Matter of Law.*

"(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

Latina's negligence had been stricken from the record, there was no expert testimony presented by defendant to contradict the opinions of the plaintiff's experts about the standard of care and Dr. Latina's consequent negligence. Therefore, she ruled that because the standard of care was conclusive identification of the correct anatomical structures and because Dr. Latina misidentified the cystic duct and cut the common bile duct by mistake, it was legally impermissible for the jury to render a verdict for defendant.

After she arrived at that decision, the trial justice informed counsel that she would return the question of damages to the jury. The defendant vehemently objected, asserting that it was manifestly unreasonable and prejudicial to ask a jury to assess damages in a case in which the trial justice has determined that its verdict was unreasonable. The trial justice disagreed, and asked the jury to answer the second question on the verdict sheet that asked what damages Franco had incurred as a result of Dr. Latina's negligence. The jury, after some deliberation, notified the trial justice that it was confused about the issue of negligence. The trial justice then instructed the panel that it was to consider that negligence was not an issue in the case, but merely to determine what monetary damages Franco incurred. The jury complied and returned a damage award of $525,000. Doctor Latina filed a timely appeal.

## II

### Issues on Appeal

On appeal, Dr. Latina has identified four rulings of the trial justice that he believes warrant reversal of the judgment. First, he maintains that the decision to strike the opinion testimony of Dr. Ferguson was an abuse of discretion. Second, he contends that the trial justice improperly weighed the evidence and assessed the credibility of witnesses when considering plaintiff's motion for judgment as a matter of law. Third, he maintains that the trial justice committed error when she denied his motion for a mistrial after the testimony of Dr. Ferguson was stricken from the record. Finally, he asserts that the trial justice's decision to submit the question of damages to the same jury that had returned a defendant's verdict on liability was unfairly prejudicial to him, and therefore error.

## III

### Standard of Review

We review the decision of a trial justice to allow expert opinion testimony for abuse of discretion. *State v. D'Alessio,* 848 A.2d 1118, 1123 (R.I.2004). "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." R.I. Evid. R. 702. When presenting opinion testimony, "an expert witness shall be first examined concerning the facts or data upon which the opinion is based." R.I. Evid. R. 705. An expert opinion must be derived from sufficiently articulated facts to allow the trial justice to determine whether the opinion elicited has probative force or is merely speculative. *Gorham v. Public Building Authority of Providence,* 612 A.2d 708, 717 (R.I.1992). "An expert may not give an opinion without describing the foundation on which the opinion rests." *Id.* (quoting *Nasco, Inc. v. Director of Public Works,* 116 R.I. 712, 721, 360 A.2d 871, 876 (1976)).

Our review of a decision on a motion for judgment as a matter of law is *de novo. Pezzuco Construction, Inc. v. Melrose Associates, L.P.,* 764 A.2d 174, 177

(R.I.2001). Accordingly, we employ the same standards as the trial justice in reviewing the evidence. *Tedesco v. Connors*, 871 A.2d 920, 927 (R.I.2005). The trial justice will grant the motion if, after viewing the evidence in the light most favorable to the nonmoving party, she determines that the nonmoving party has not presented legally sufficient evidence to allow the trier of fact to arrive at a verdict in his favor. *Id.* We will overturn a trial justice's decision to grant a motion for judgment as a matter of law if we determine that the trial justice has invaded the province of the jury by weighing the evidence and assessing the credibility of witnesses. *Calise v. Curtin*, 900 A.2d 1164, 1168 (R.I.2006). The decision whether to grant a motion for mistrial is within the sound discretion of the trial justice. *Romano v. Caldarone*, 78 R.I. 107, 112–13, 79 A.2d 763, 766 (1951).

## IV

### Analysis

### A

### Doctor Ferguson's Opinion Testimony

Doctor Latina urges that the trial justice improperly struck the opinion testimony of Dr. Ferguson in which the defense expert opined that Dr. Latina was not negligent when he did the laparoscopic cholecystectomy. In the course of direct examination, Dr. Ferguson first testified that he "object[ed] to the concept of a standard of care." Later, when asked "what was the standard of care when performing the infundibular technique in the removal of the gallbladder * * *," he responded that "it would be to identify the cystic duct and the cystic artery, [and] to clip and divide the cystic duct and cystic artery * * *." On cross-examination, Franco's counsel asked Dr. Ferguson whether he agreed that plaintiff's injury was the result of Dr. Latina's misidentification of the cystic duct, and Dr. Ferguson responded in the affir-

mative. At that point, plaintiff moved to strike the portions of Dr. Ferguson's testimony that offered the opinion that Dr. Latina acted within the standard of care and was not negligent because Dr. Ferguson's opinion as to negligence did not coincide with an articulated standard of care for the procedure. Doctor Latina countered that Dr. Ferguson was a qualified expert and that his opinion should not be stricken, but rather was entitled to be weighed by the jury.

In her decision to strike the testimony, the trial justice delivered a detailed rationale for her ruling:

> "[Dr. Ferguson] has described complications in the procedure that could lead to misidentification but he has not altered the standard of care as eliminating correct identification and therein lies the essential problem with regard to his opinion testimony. When he gives his opinion that Dr. Latina was not negligent in performing plaintiff's surgery, he does not marry that testimony with the standard of care. In essence, his conclusion is misidentification is not negligent because it is evidence of human error. That basis for an opinion as to the non-existence of negligence, or an opinion as to whether there was a deviation from the standard of care, is not responsive to the underpinnings of what the standard of care requires. * * *. So the motion to strike is granted."

On appeal, Dr. Latina urges us to hold that the trial justice's decision to strike Dr. Ferguson's opinion testimony was an abuse of discretion because the shortcomings that the trial justice articulated about Dr. Ferguson's testimony were relevant to the weight it should be afforded, but did not provide grounds to strike it.

Although it is certainly true that a qualified expert may offer testimony in the form of opinion, the witness neverthe-

less must set forth a sufficient basis for that opinion. R.I. Evid. R. 705. Furthermore, the decision to allow an expert opinion is within the sound discretion of the trial justice and will be disturbed only for an abuse of that discretion. *D'Alessio,* 848 A.2d at 1123.

Doctor Latina suggests that our decision in *Morra v. Harrop,* 791 A.2d 472, 477 (R.I.2002), in which we held that it was error for the trial justice to strike the expert testimony of a medical examiner about cause of death because it was articulated in terms of possibility, supports his argument that Dr. Ferguson's opinion should have been allowed. However, *Morra* is easily distinguishable.

In *Morra,* the expert witness reviewed the case of a psychiatric patient who was found dead near the grounds of Butler Hospital in order to present expert testimony about the cause of death. *Morra,* 791 A.2d at 474–76. After eliminating all other potential causes of death, the expert doctor testified that in his opinion "the only possibility was suicide by drowning." *Id.* at 476. The trial justice disallowed the testimony because the expert medical witness used the term "possibility" when he gave his opinion, reasoning that "possibility [was] not enough in medical negligence cases." *Id.* However, we reversed on appeal, holding that because the expert rendered an opinion that suicide was the only possible cause of death, he had ruled out all other possible causes. *Id.* at 477. Thus, we held that the expert testimony in that case was proffered with the requisite degree of certainty, and that it was an abuse of discretion to disallow it. *Id.* at 477–78.

In this case, however, the trial justice did not strike Dr. Ferguson's testimony because he failed to express his opinion with sufficient certainty. Rather, the trial justice ruled that Dr. Ferguson's opinion about Dr. Latina's freedom from negligence could not be reconciled with his opinion about the appropriate standard of care for performing laparoscopic cholecystectomies.

The defendant also directs our attention to *Gallucci v. Humbyrd,* 709 A.2d 1059, 1064, 1065 (R.I.1998), in which we reversed the trial justice's decision to strike the expert opinion of a physical therapist regarding causation of an injury because the witness' opinion was based on his mistaken belief that the patient engaged in exercises using a greater amount of weight than actually used. In reaching that holding we noted that it was significant that the expert's opinion, though derived from information that provided an incorrect amount of weight, attributed the cause to the performance of any active exercise, without regard to the amount of weight used. *Id.* at 1064. We held that because the opinion was based on relevant facts and was tied to an articulated standard of care, it was an abuse of discretion to strike portions of the expert's opinion regarding causation. *Id.* at 1064–65.

Here, however, the trial justice made it absolutely clear that her decision to strike Dr. Ferguson's testimony was not because he was unqualified to testify as an expert, nor was it predicated on incorrect or inadequate materials or facts that he relied upon in reaching his opinion. Instead, the trial justice struck Dr. Ferguson's opinion that Dr. Latina was not negligent because she was unable to see any relationship between his opinion and the standard of care to which he and the other experts testified to during the course of the trial.

Undaunted, Dr. Latina presses the argument that the apparent disconnect between Dr. Ferguson's opinion on negligence and the standard of care to which he himself testified does not justify striking the opinion, but rather goes to the weight of the evidence. In making this

argument, he points to *Owens v. Silvia*, 838 A.2d 881, 892 (R.I.2003) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)), in which we said "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." However, Dr. Latina's reliance on this language in *Owens* overlooks our focus in that case on the importance of the trial justice's gatekeeping role when it comes to admitting expert opinions. Indeed, in *Owens*, we highlighted the role of the trial justice in ensuring that the opinions provided by experts present a "scientifically valid theory" because their opinions frequently lack the benefit of "first-hand knowledge or observations of the factual circumstances at issue," and because expert opinion testimony can be, by its very nature, both " 'powerful and quite misleading.' " *Owens*, 838 A.2d at 891 (quoting *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786).

We do not question Dr. Latina's description of Dr. Ferguson as a knowledgeable and respected physician and not a "charlatan or a purveyor of junk science." *See Gallucci*, 709 A.2d at 1064. In her decision to strike Dr. Ferguson's opinion regarding Dr. Latina's negligence, the trial justice did not question Dr. Ferguson's credentials either. But, the trial justice aptly noted that his ultimate opinion with regard to negligence was not logically tied to what he conceded was the proper standard of care for the procedure. In light of Dr. Ferguson's testimony that he "object[ed] to the concept of a standard of care," his concession that identification of the correct anatomical feature was required, and his testimony that Dr. Latina's mistake in performing Franco's surgery was "human error," we hold that the trial justice was performing her necessary duty as a gatekeeper when she removed this

"powerful and * * * misleading" evidence from the consideration of the jury. *See id.*

## B

### Judgment as a Matter of Law

The defendant does not quibble with the standard articulated by the trial justice when she rendered her decision on plaintiff's motion for judgment as a matter of law. Instead, Dr. Latina contends that the trial justice did not properly apply that standard because she invaded the province of the jury by weighing the evidence and assessing the credibility of the witnesses.

At the outset of her bench decision on the plaintiff's motion for judgment as a matter of law, the trial justice set forth the standard to be applied:

"[T]his Court must consider whether the evidence, when viewed in the light most favorable to the defendant, without regard to the weight or credibility of the evidence, entitles the plaintiff to judgment as a matter of law as to the question of the defendant's negligence. In short, this Court must decide if the question of negligence was one of fact for the jury."

Without doubt, this standard clearly is consistent with the standard we have described for deciding motions for judgment as a matter of law. *See, e.g., Calise*, 900 A.2d at 1167–68 (" 'consider[ing] the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses,' * * * '[i]f * * * there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on that issue, the court * * * may grant a motion for judgment as a matter of law' "); *Mead v. Papa Razzi Restaurant*, 840 A.2d 1103, 1107 (R.I.2004) ("We view the evidence in the light most favorable to the nonmoving party and draw all reasonable, favorable inferences from that testimony, without weighing the testimony or assess-

ing the credibility of witnesses. * * * This Court will affirm the grant of a motion for judgment as a matter of law only if there are no issues of fact upon which reasonable minds may differ."). The trial justice's grant of plaintiff's motion for judgment as a matter of law was grounded in her finding that there was no competent expert testimony other than "conclusive and unmistakable identification in fact of the cystic duct before cutting" as the standard of care for laparoscopic cholecystectomy. In stating her rationale, she made no mention of competing evidence that she weighed, nor did she discuss the relative believability of the plaintiff's experts as opposed to the defendant's witnesses. Thus, on the face of the decision, there is no error in the trial justice's application of what defendant admits is a properly described standard for deciding a motion for judgment as a matter of law.

But, Dr. Latina argues, the trial justice could not have reached the conclusion that no evidence existed of any standard of care other than "conclusive and unmistakable identification in fact of the cystic duct before cutting" unless she improperly weighed the evidence and assessed the credibility of the witnesses. To support this contention, defendant directs our attention to what he says are significant inconsistencies in the testimony of Dr. Brock and Dr. Moossa regarding the standard of care, the testimony of Dr. Latina with regard to a different, subjective, standard of care, and the inherent improbability of portions of the testimony of plaintiff's experts.

**1**

### Inconsistencies in the Testimony of Dr. Brock and Dr. Moossa

Doctor Latina points out that during the protracted discovery and litigation in this case, Dr. Brock has at various times testified that the injury that Franco suffered could have occurred even if the standard of care was followed. In particular defendant highlights a portion of the cross-examination of Dr. Brock in a 2000 deposition:

"Q Okay, so you had learned from the literature you had studied, from the doctors whose experience you defer to, that this operation can be done within the standard of care, doing all the techniques, on a patient like Mrs. Franco, who had no hostile environment,[12] and still, this injury could occur, correct?

"A That was their opinion.

"Q Which you adopted, correct?

"A At the time."

The above colloquy may show that, in the past, Dr. Brock accepted the opinion that the injury Franco sustained could occur when the standard of care was met. However, it does not show that Dr. Brock was of the opinion that the cystic duct could be misidentified while performing a laparoscopic cholecystectomy within the standard of care. Furthermore, it is readily apparent from a fair review of all Dr. Brock's testimony that his expert opinion was that the standard of care required conclusive identification of the cystic duct before cutting.[13] Even if Dr. Brock's testimony

12. The record shows that, in a laparoscopic cholecystectomy, the term "hostile environment" refers to situations in which the condition of a patient's body impede the surgeon's ability to see, navigate, and separate the anatomy of a patient, such as when the area in which the operation is being done is overrun with cancer or scar tissue.

13. When asked to describe the procedure for a laparoscopic cholecystectomy, Dr. Brock responded, in pertinent part, that a doctor must "conclusively identify that [the structure he is looking at] is the cystic duct." Later, he was asked if "the standard of care, as you are testifying it is, required the surgeon to make conclusive identification of the cystic duct before doing any clipping or cutting," to which

could give rise to an inference that, in a hostile environment, the standard of care may not demand conclusive identification, it is undisputed that Franco's surgery did not take place in a hostile environment. Therefore, any testimony referring to that circumstance has no relevance.

Doctor Latina also suggests that Dr. Moossa was inconsistent in terms of how he defined the standard of care when hostile conditions were present. But again, it is undisputed that Franco's surgery was not performed under hostile conditions. Doctor Moossa testified unequivocally that the standard of care for laparoscopic cholecystectomy required correct, in-fact identification of the cystic duct before any clipping or cutting took place.[14] After scouring the record, we see no inherent inconsistencies between the testimony of Dr. Brock and Dr. Moossa concerning the applicable standard of care, and there are no substantial differences between the opinions of the two plaintiff's experts as to what constitutes that standard of care for the surgical procedure in question. Both doctors agree that conclusive, unmistakable, in-fact identification of the cystic duct is required before any cutting takes place when performing a laparoscopic cholecystectomy.

■ We have held in the past that we will overturn a trial justice's decision granting a motion for judgment as a matter of law when the trial justice has "invaded the province of the jury by impermissibly finding facts." *Martino v. Leary*, 739 A.2d 1181, 1183 (R.I.1999). However, the trial justice cannot be said to have "found facts" when all she has done is accept uncontradicted testimony. In fact we have previously held that rejecting uncontroverted medical testimony is a "manifest error of law." *Villa v. Eastern Wire Products Co.*, 554 A.2d 644, 647 (R.I.1989). In this case the trial justice did not err in concluding that the testimony of Drs. Brock and Moossa was consistent that the standard of care required the correct identification of the cystic duct, and we agree with the trial justice that there was no inconsistency between the opinions of the plaintiff's experts. In our opinion, in completing this arduous task, the trial justice did not improperly weigh the evidence or assess the credibility of the witnesses.

### 2
### Doctor Latina's Testimony of a Subjective Standard of Care

Doctor Latina also faults the trial justice for dismissing his own testimony that the standard of care required that the surgeon be certain—but only in his own mind—that the anatomical structure he was cutting was the cystic duct. In her decision on the motion for judgment as a matter of law, the trial justice explained that the evidence was discounted because it was not elicited to a "reasonable degree of medical certainty," as is required of expert medical testimony. The plaintiff also argues that Dr. Latina was not disclosed as an expert witness and thus was not in a position to give expert testimony at trial.

■ Rule 26(b)(4) of the Superior Court Rules of Civil Procedure [15] requires a party to disclose any and all expert

---

14. In response to a question asking him to tell the jury what the standard of care requires in a laparoscopic cholecystectomy, Dr. Moossa testified that "the surgeon has to be very, very clear that he identifies correctly every structure before he clips, ligates or divides that structure," identifying that as "the safety factor for the patient."

15. Rule 26(b)(4) of the Superior Court Rules

---

he responded, "yes." When asked what he meant by conclusive identification, Dr. Brock answered, "That there can be no alternative possibility." When asked whether variants in a patient's anatomy can create a danger of misidentifying the cystic duct, Dr. Brock retorted, "No, it is the surgeon who creates the danger, not the anatomy."

witnesses he wishes to call when requested to do so by interrogatory of the opposing party.[16] While it is true that we have said that "talismanic incantations have been eschewed by this Court, the expert witness must testify that the opinions offered rise to the level of reasonable medical certainty, that is, some degree of positiveness or probability and not possibility." *Riley v. Stone,* 900 A.2d 1087, 1092 (R.I.2006). Additionally, a trial justice, when deciding to grant a motion for judgment as a matter of law, is not required to find that no evidence whatsoever exists in opposition to the result sought by the moving party, but rather that the evidence, taken as a whole, does not raise a legally sufficient question of fact to be decided by the jury. *Hanson v. Singsen,* 898 A.2d 1244, 1248 (R.I.2006).

■ When Dr. Latina testified that he believed that the standard of care required only that the surgeon be certain, in his own mind, that he had identified the cystic duct, plaintiff immediately questioned him

as to whether he was aware of any scholarly article or medical textbook that espoused that theory of the standard of care for laparoscopic cholecystectomies. Doctor Latina candidly answered that he knew of none. The plaintiff also repeatedly pressed Dr. Latina about whether he was truthful when he previously testified under oath that the standard of care "was not to do what you did in this case, which is to think that you were there at the cystic duct, but to do whatever it takes to do to know that what you think is the cystic duct, is the cystic duct," and Dr. Latina said that he was being truthful then as well as now.

We conclude that it was not necessary for the trial justice to weigh the evidence to find that Dr. Latina's opinion with regard to the standard of care was inadequate to raise a legally sufficient factual dispute about what the standard of care was for a laparoscopic cholecystectomy. The lack of any foundation for his opinion

of Civil Procedure says:
"*Trial Preparation: Experts.*
"(A)[ (i) ] A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (ii) Upon motion the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(4)(C) of this rule, concerning fees and expenses as the court may deem appropriate. In the absence of agreement between the parties as to the timing of disclosures required under this subdivision, any party may apply to the court for an order establishing a schedule of such interrogatories, responses, and depositions. Obligation to respond to interrogatories shall be stayed until the ruling on the application.
"(B) A party may discover facts known and opinions held by an expert who has

been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.
"(C) Unless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision; and (ii) with respect to discovery obtained under subdivision (b)(4)(B) of this rule the court shall require the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert."

16. Franco did propound an interrogatory to Dr. Latina asking him to disclose the experts he intended to produce at trial.

means that his testimony falls short of the standard that expert medical opinion be stated to a "reasonable medical certainty." *Riley*, 900 A.2d at 1092. Thus, we hold that the trial justice did not run afoul of the standard for deciding a motion for judgment as a matter of law when she found that Dr. Latina's testimony did not present a question of fact for the jury.

### 3

### Inherent Improbability

The defendant also urges this Court to hold that the trial justice was not required to accept the uncontroverted opinion testimony of Drs. Brock and Moossa because it was inherently improbable. To support this argument, Dr. Latina casts their opinions as creating a necessary implication that both Dr. Latina and the surgeon who assisted him during Franco's gallbladder surgery, Salvatore Azzoli, M.D., were aware that they made a mistake during the procedure but, rather than fix it, completed the procedure and sent Franco on her way despite the inevitability of future complications. The portion of the testimony that Dr. Latina believes gives rise to this assumption is Dr. Moossa's statement that Dr. Latina had to have made two cuts when cutting the common bile duct, even though the procedure calls for one. This testimony, Dr. Latina says, is inherently improbable because if Dr. Latina made two cuts when only one was required, he must have been aware that there was a mistake or problem. In essence, Dr. Latina contends that Dr. Moossa accuses him of actions which are highly unethical, if not criminal. Further, Dr. Latina contends there is inherent improbability in the testimony of Dr. Brock because of internal inconsistencies.

 Uncontradicted testimony may be rejected if it contains inherent improbabilities. *State v. A. Capuano Bros., Inc.*, 120 R.I. 58, 63–64, 384 A.2d 610, 613

(1978). In *Gaudette v. Carter*, 100 R.I. 259, 262–63, 214 A.2d 197, 199–200 (1965), we held that a trial justice acted properly when he rejected uncontroverted testimony from witnesses who said they did not overhear slanderous language that was being shouted just slightly more than an arm's length away from them.

The testimony presented in this case does not present a situation like that in *Gaudette*, where common sense dictated that the witnesses' testimony was improbable. *See Gaudette*, 100 R.I. at 262–63, 214 A.2d at 199–200. Instead, Dr. Latina asks us first to adopt his interpretation of Dr. Moossa's testimony in which he alleges that Dr. Moossa believed that Dr. Latina was aware of the fact that he had made a mistake during Franco's surgery, but chose not to correct it. Doctor Moossa never testified to that effect, nor is that inference reasonable from his testimony. So, even though we are required to draw all reasonable inferences from the evidence in favor of defendant, we are not permitted to follow Dr. Latina to this unreasonable conclusion. With regard to the suggestion that the testimony of Dr. Brock was inherently improbable because of internal inconsistencies, we already have addressed and rejected the pertinent arguments regarding those inconsistencies in Part IV(B)(1) of this opinion. Therefore, we hold that it was proper for the trial justice to accept the uncontroverted expert opinion testimony of Dr. Brock and Dr. Moossa because it was not inherently improbable.

After a meticulous review of the trial record, and a thorough examination of the arguments raised by Dr. Latina, we are convinced that the trial justice was correct when she entered judgment as a matter of law for plaintiff. The expert testimony of Dr. Brock and Dr. Moossa was uncontradicted with regard to the applicable standard of care for plaintiff's laparoscopic cholecystectomy, and it was not inherently

improbable. Doctor Latina's attempt to proffer an opinion that contradicted that testimony by inserting an ungrounded, subjective element into the standard of care does not raise a legally sufficient question about the applicable standard of care to be submitted to a jury. We therefore hold that judgment as a matter of law in favor of Franco was warranted.

## C

### Motion for Mistrial and Jury Determination of Damages

The defendant's two remaining contentions are that the trial justice abused her discretion when she denied his motion for mistrial after she struck the opinion of Dr. Ferguson and that it was improper to submit the question of damages to the jury after effectively negating the jury's verdict on the issue of liability.

The decision whether to grant a motion for mistrial is within the sound discretion of the trial justice. *Romano*, 78 R.I. at 112–13, 79 A.2d at 766. During the trial, defendant's sole argument to support his motion for a mistrial was that striking his expert's opinion unfairly prejudiced his case. On appeal, he cites *Morra* for the proposition that a trial justice should grant a continuance to a party after rejecting the testimony of an expert witness in order to provide a fair opportunity to secure another expert. *Morra*, 791 A.2d at 478 (striking an expert witness' testimony and then denying a brief continuance is reversible error).

■■■ In this case, however, Dr. Latina did not request a continuance. And, the trial justice explained that the procedural posture of the case provided defendant with fair advance warning that opinion testimony untethered to the standard of care was vulnerable to a motion to strike.

■■■ Finally, defendant contends that it was error for the trial justice to submit the question of damages to the same jury that had found him not to be negligent, only to have the liability issue subsequently removed from it. Doctor Latina posits that Rule 49 of the Superior Court Rules of Civil Procedure [17] supports this argument and suggests that a New Jersey case,

17. Rule 49 of the Superior Court Rules of Civil Procedure reads:

"(a) *Special Verdicts*. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury re-

tires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

"(b) *General Verdict Accompanied by Answer to Interrogatories*. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent

*Johnson v. Salem Corp.*, 97 N.J. 78, 477 A.2d 1246 (1984), does as well. The linchpin of the argument is that submission of the question of damages to the jury was a special interrogatory that asked the jury to render a new verdict inconsistent with its general verdict, something our sister state of New Jersey found to be impermissible. *Id.* at 1257.

We do not believe that the defendant's characterization of the damages question submitted to the jury is accurate. The original general verdict form had two questions on it,[18] one as to the jury's decision on Dr. Latina's liability for negligence and the other asking the jury to determine what damages Franco sustained as a result of that negligence. After she granted judgment as a matter of law in favor of the plaintiff, the trial justice asked the jury to decide the question of what amount of monetary damages Franco sustained as a result of Dr. Latina's negligence. When the jurors expressed confusion about the phrase "as a result of defendant's negligence" in the damages question, the trial justice explained that they were now to assume that negligence no longer was an issue.

The trial justice did not send a special interrogatory to the jurors, but rather asked them to answer a second question that was only slightly amended from that which was on the original general verdict form. We see no merit in Dr. Latina's argument that this was an improper use of special interrogatories.

The defendant also argues that the jurors would be motivated to issue a higher than justified damages verdict because they would know that the trial justice had overruled them. This argument is specious at best. Doctor Latina cites no authority for that proposition, and our own research has not uncovered any. We therefore reject the defendant's contention that asking the same jury to determine damages was error.

## V

### Conclusion

For the reasons stated in this opinion, the judgment of the Superior Court is

---

with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

"(c) *Verdicts on Multiple Counts.* In cases tried by a jury on more than one count, the court may require the jury to return a separate verdict as to each count."

**18.** The original jury verdict form read as follows:

"1. Do you find that plaintiff Linda Franco has proven, by a preponderance of the evidence, that defendant Joseph A. Latina was negligent in performing her laparoscopic cholecystectomy on January 31, 1996, and that as a proximate result thereof she sustained personal injury?

"**CHECK ONE YES_____ NO_____**

"If your answer to this question is **YES**, please proceed to the next question. If your answer is **NO**, please return your verdict in favor of the defendant Joseph A. Latina on liability and proceed no further with this form.

"2. What is your determination as to the amount of monetary damages sustained by plaintiff Linda Franco?"

On that form, the jury checked "**NO.**" After the trial justice granted plaintiff's motion for judgment as a matter of law, she submitted the following verdict form to the jury:

"1. What is your determination as to the amount of monetary damages sustained by plaintiff Linda Franco as a proximate result of the negligence of Defendant Joseph A. Latina in performing her laparoscopic cholecystectomy on January 31, 1996?"

affirmed and the papers in this case are remanded to it.