Kenneth J. GIANQUITTI et al.

v.

ATWOOD MEDICAL ASSOCIATES, LTD. et al.

No. 2006–99–Appeal.

Supreme Court of Rhode Island.

July 1, 2009.

 

priapism.[1] Because of the length of time that passed before the plaintiff was treated for this condition, he has been left with permanent tissue damage and erectile dysfunction.

Mr. Gianquitti and his wife, Denise Gianquitti (plaintiffs), filed a medical malpractice suit against Roger Williams, Dr. Warshaw, and Atwood. At the conclusion of all the evidence at trial, the trial justice granted defendant Atwood's motion for judgment as a matter of law on plaintiffs' claim of direct liability against it, pursuant to Rule 50 of the Superior Court Rules of Civil Procedure.[2] Thereafter, the jury returned a verdict in favor of Dr. Warshaw and Roger Williams, finding that they were not negligent in their care and treatment of Mr. Gianquitti. In plaintiffs' appeal to this Court, they assert that the trial justice committed reversible error by: (1) granting Atwood's Rule 50 motion for judgment as a matter of law; and (2) refusing to give the jury a requested instruction on the duty of interns and residents at Roger Williams. The plaintiffs have not appealed the jury's verdict in favor of Dr. Warshaw. For the reasons stated in this opinion, we affirm the judgment of the Superior Court in favor of Roger Williams and we vacate the judgment entered as a matter of law in favor of Atwood.

Howard B. Klein, Esq., Providence, for Plaintiff.

Francis A. Connor, III, Esq., Matthew D. Kelly, Esq., Providence, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice FLAHERTY, for the Court.

On the Christmas weekend of 2000, James A. Warshaw, M.D. (Dr. Warshaw) was the on-call attending physician for the defendant, Atwood Medical Associates, Ltd. (Atwood), a medical group serving about 5,000 patients, including the plaintiff, Kenneth J. Gianquitti. Atwood had become involved in Gianquitti's care in August 2000 for the treatment of a deep-vein thrombosis, or blood clot, that had developed in his left leg after surgery. On December 22, 2000, Dr. Warshaw admitted Gianquitti to Roger Williams Medical Center (Roger Williams) and ordered that he receive intravenous heparin therapy. Soon thereafter, Gianquitti developed a ,

**Facts and Procedural History**

**The Patient's Background**

Gianquitti became a patient of Atwood in August 2000 for treatment of a deep-vein thrombosis (DVT) that had developed in his left leg after surgery to repair a rupture in his left patellar tendon in July

---

1. A priapism is a persistent erection of the penis not as a result of sexual desire.

2. The plaintiffs also had made a claim against Atwood based on its vicarious liability for the alleged negligence of Dr. Warshaw.

2000. When he reported to Atwood, he had been taking an anticoagulant medication called Coumadin for about a week. Kathleen Gordon, M.D. (Dr. Gordon), an internist associated with Atwood,[3] directed that Gianquitti continue to take Coumadin to prevent any progression of the blood clot. But, on December 21, 2000, Gianquitti visited Dr. Gordon, complaining of leg swelling. The doctor ordered an ultrasound to determine whether the blood clot was resolving. The next day, on December 22, 2000, at approximately 5 p.m., Gianquitti went to Roger Williams to undergo the ultrasound, and based on the test results, Dr. Warshaw, an internist on call for Atwood, admitted Gianquitti to the hospital.

## The Patient's Admission to Roger Williams

Doctor Warshaw began his on-call duties at 5 p.m. on December 22, 2000. As set forth above, based on an oral report he received from the radiology technician about the results of the ultrasound, Dr. Warshaw ordered that Gianquitti be admitted to Roger Williams. Doctor Warshaw believed that Gianquitti's DVT was of an emergency nature and that it required heparin to be administered to him intravenously.[4] However, Dr. Warshaw testified that he admitted Gianquitti as a nonteaching patient, which meant that as the attending physician, he, and not the interns or residents working at the hospital, would be responsible for all communications with

the nurses as well as all examinations of and orders for the patient. Doctor Warshaw said that one of the reasons the patient was admitted as nonteaching was because he did not have the time to deal with multiple telephone calls from the interns and residents. He also said that he did not have time for teaching duties because of the "intensity of the weekend."

On the evening of December 22, 2000, the nurses at Roger Williams placed Gianquitti on heparin as ordered by Dr. Warshaw. Gianquitti said that at around 11 p.m. he began to experience the priapism. He testified that at around midnight, the nurse on duty came into his room and that he informed her that he had an erection. Later on, at some point between 2 and 3 a.m., the nurse returned, and he told her that he wanted to see a doctor because he continued to experience an erection. He said that the nurse replied that he would have to wait until the morning.[5] Gianquitti also said that at some time between 7 and 8 a.m., two young doctors came into his room. He said that he believed them to be interns, although he could not explain what led him to that conclusion. He testified that they examined him, asked him some questions, and told him he would have to wait to see his own doctor. Gianquitti also said that the nurse who was on duty at 7 a.m., Nurse Lorelle Lemoi–Brown, already was aware of his priapism when she attended to him, and that she tried to page Dr. Warshaw that morning.

---

3. An internist is a doctor specializing in internal medicine.

4. Heparin is an anticoagulation medication. The testimony at trial established that intravenous heparin is the accepted method for treatment of a DVT and that a heparin-induced priapism is a rare occurrence. In July 2000, Gianquitti was given heparin to treat the DVT, and he did not have any adverse reaction to the medication at that time.

5. Paula Bousquet testified that she was the nurse on duty at the hospital from 11 p.m. on December 22, 2000, to 7 a.m. on December 23, 2000. She said that she had no recollection of Gianquitti and denied that any patient to whom she attended reported having an erection. She testified that had a patient reported having a persistent erection, she would have reported it to the nursing supervisor or the attending physician.

However, Nurse Lemoi–Brown testified that she reported to work at the hospital at about 6:45 a.m. on December 23, 2000. She testified that at approximately 10 a.m. she went into the patient's room to adjust the heparin drip and that it was then that Gianquitti informed her that he had been experiencing a persistent erection since the previous evening. She acknowledged that she understood that the situation required urgent medical attention.[6] She said that after she learned of the patient's condition, she immediately attempted to page the on-call doctor. The paging records reflected that the first call to Atwood's answering service took place at 10:49 a.m. and that a second call was made at 11:23 a.m.

Nurse Lemoi–Brown also testified that at some point after she called Dr. Warshaw, she mentioned the patient's condition to one or two male interns that she happened to see in the hallway. She recalled that the interns said that she would be required to address the problem because the patient was a nonteaching patient. She recalled that she replied that she already had addressed the problem by calling the on-call attending physician. She further testified that she did not know whether the interns to whom she spoke ever examined Gianquitti.

### Dr. Warshaw's Response

Doctor Warshaw recalled that he was paged by Nurse Lemoi–Brown on December 23, 2000 between 11 a.m. and noon and that he returned the page at noon. Lemoi–Brown informed Dr. Warshaw that Gianquitti had reported a persistent erec-

tion since the night before. He testified that he knew that this was a condition requiring urgent medical attention and that he believed the "treatment window" was about twenty-four hours to avoid permanent injury. He ordered Lemoi–Brown to cease the patient's intravenous heparin and to give him Coumadin instead.

It is significant that when Dr. Warshaw received the call from Roger Williams, he was in the intensive care unit at Fatima Hospital attending to other patients of Atwood. On that day, Atwood had approximately twenty patients at Fatima for whom Dr. Warshaw was responsible. As a general practice, he said, when he was on duty, he rounded on the patients in intensive care first.[7] He testified that he finished up at Fatima as quickly as possible, and shortly after returning Nurse Lemoi–Brown's call, he drove to Roger Williams.

Doctor Warshaw estimated that he arrived at Roger Williams between 1 and 2 p.m. He acknowledged that had he been notified the night before or early in the morning of the patient's persistent erection, he immediately would have ordered the nurse to stop the heparin, he would have come to see the patient, and after examining him, he would have called a urologist. Because he had had experience with specialists who were reluctant to visit hospital patients who had not been examined by their own physician, he said that he believed it necessary to examine the patient before contacting the urologist.

When Dr. Warshaw arrived at the hospital and spoke to Gianquitti, the patient told him that he had been experiencing an

---

6. Nurse Lemoi–Brown testified that she had attended to the patient earlier that morning, and he did not report the problem to her at that time.

7. According to Dr. Warshaw, "rounding" is the practice of the attending physician, intern,

or resident to visit patients who are admitted to a hospital. He added that it is important that a patient is seen each morning by a physician during rounding to assess what is happening with the patient.

erection since about 10 p.m. the previous night. The doctor estimated that he spent thirty to forty-five minutes with Gianquitti and he then placed a call to a urologist for a consultation. He said that he first attempted to contact a urologist whom Atwood frequently used by leaving a message with the physician's answering service. Later that afternoon, the message was returned by Alan Rote, M.D. (Dr. Rote), the urologist on call. Doctor Warshaw informed Dr. Rote of the patient's condition, and Dr. Rote instructed Dr. Warshaw to apply an icepack and administer terbutaline, an oral medication. Doctor Warshaw followed Dr. Rote's directions, and he also prepared additional medications that Dr. Rote had indicated he would administer to the patient when he arrived at the hospital. Doctor Rote testified that he understood the patient's condition presented an "urgent situation," and so he traveled to the hospital as quickly as he could. He arrived at Roger Williams at approximately 6 p.m. and attempted to treat the priapism. However, despite the doctor's efforts, the patient was rendered permanently incapable of achieving an erection because of the length of time that his condition had remained untreated.

### Testimony Pertaining to Atwood's Coverage

At trial, Dr. Gordon testified that there was no backup system in place at Atwood to provide on-call physician assistance if the demands of the group's patients became too much for one doctor. Counsel also asked Dr. Warshaw whether there was any mechanism in place whereby he could look to other physicians for assistance if circumstances arose while he was the covering doctor that would prevent him from attending to all the patients' needs. Doctor Warshaw responded in the affirmative and explained that specialists within the Atwood group were available, such as a cardiologist, if a patient was having a heart attack, as well as a doctor in the critical-care unit. However, he explained that if he simply required assistance in attending to all the hospitalized or ill patients while on call, no mechanism was in place that would allow him to call a backup internist. He acknowledged that on December 23, 2000, he was covering for eight to ten internists in the group and they were not available for him to call on for backup while he was rounding at Fatima Hospital. He also acknowledged that it is important for a patient who is admitted to a hospital to be seen each morning by a doctor during rounding, and he conceded that he had not seen Gianquitti on the morning of December 23, 2000. He agreed that it was likely that if he had not had patients in the intensive care unit at Fatima that morning, he would have gone to Roger Williams to examine Gianquitti.

The following dialogue took place between plaintiffs' counsel and Dr. Warshaw:

"Q: Stick with me, Doctor. You've told us earlier that it was your custom and your practice when having patients in the hospital to see them in the morning because you need to know what's going on with them and what needs to be done with them, correct?

"A: Correct.

"Q: Generally. And you couldn't do that with Ken Gianquitti because you were serving as on-call physician for your group in internal medicine, which comprised 5,000 patients, and you had 20 hospitalized patients in another hospital and, because of that, you couldn't see Ken in the morning at the hospital, correct?

"A: Correct.

"Q: Okay. So but for your obligations as on-call physician attending to a num-

ber of different patients, but for that, you would have been able to go over to the hospital to see Ken in the morning at Roger Williams, correct?

"A: Correct.

"Q: At the time that you customarily do that—which is seven, eight or nine o'clock in the morning, is that fair?

"A: Correct.

"Q: Okay. So because you were responsible for all these other patients at the other hospital, you were not able to observe his priapism on the morning of December 23rd at eight o'clock or seven o'clock or nine o'clock in the morning, correct?

"A: Correct.

"Q: Okay. And had you been able to go to Roger Williams Hospital at seven o'clock in the morning or eight o'clock in the morning or nine o'clock in the morning on December 23rd, you would have detected and diagnosed his priapism because he had it at the time, correct?

" * * *

"A: Correct.

" * * *

"Q: And what would you have done?

"A: I would have called urology."

On the other hand, Dr. Warshaw testified that he responded to Gianquitti within a timely fashion once he received the call notifying him of the patient's condition. He said that during that morning, he did not consider calling for relief or backup from a member of Atwood, nor did he consider calling for backup to take over his responsibilities at Fatima so that he could attend to Gianquitti. In fact, Dr. Warshaw testified that when he admitted Gianquitti to Roger Williams he knew that the next morning it would be necessary to round on the patients at Fatima Hospital first, and therefore, he was aware that he would not see Gianquitti on the morning of

December 23, 2000. He testified that he decided to admit him as a nonteaching patient even though he had the option of admitting him as a teaching patient, which may have allowed the patient to be treated in the morning by an intern or resident. He testified that he did not believe he needed to see the patient the night of December 22, 2000 because the radiologist had made a DVT diagnosis and the usual therapy required intravenous heparin.

During the trial, plaintiffs presented expert testimony from Robert G. Schneider, M.D. (Dr. Schneider), a physician specializing in internal medicine. Doctor Schneider testified that he was familiar with the standard of care for medical groups providing coverage for doctors specializing in internal medicine. Doctor Schneider testified that both Dr. Warshaw and Atwood deviated from the accepted standard of care for medical providers. He offered an opinion based on the hypothetical assumptions that (1) Atwood did not arrange for a mechanism in which an on-call physician could rely upon other members of the internal medicine practitioners within the group, and (2) Dr. Warshaw had no such mechanism available to him when he was on call on December 22, 2000 and December 23, 2000, and (3) because of Dr. Warshaw's many on-call responsibilities, he was unable to attend to the patient on December 22, 2000 or in the morning of December 23, 2000. He said that, in his opinion, Atwood, the group for which Dr. Warshaw worked, deviated from the standard of care required for groups providing coverage because it is essential to have a backup system in the event of a large number of calls, if a physician becomes ill, or if other unforeseen circumstances occur. He said that without this mechanism, patients are left without appropriate medical care, and this, he opined, was the precise

position in which Gianquitti found himself on the Christmas weekend of 2000.

## Expert Testimony on Causation

To prove causation, plaintiffs presented the opinion testimony of Irwin Goldstein, M.D. (Dr. Goldstein), a physician specializing in urology and sexual medicine. Doctor Goldstein testified that it was his opinion, to a reasonable degree of medical certainty, that had Dr. Rote treated Gianquitti within twelve hours of the onset of the priapism, Gianquitti would not have suffered any permanent injury. He testified that because the priapism first occurred between approximately 10 p.m. and midnight, the patient could have been treated successfully by 10 a.m. to noon the next day.[8]

## Atwood's Rule 50 Motion

In plaintiffs' three-count complaint, they alleged that Dr. Warshaw was negligent in his diagnosis, treatment, and care of Gianquitti and that Atwood was vicariously liable for Dr. Warshaw's negligence because he was an employee who was acting within the scope of his employment. Just before the trial commenced, Atwood filed a motion *in limine* to preclude the introduction of evidence on plaintiffs' theory of direct negligence against Atwood for its on-call coverage system, on the grounds that that theory was not set forth in the complaint and that plaintiffs had failed to otherwise give notice of the claim. Atwood also argued that this theory of liability never was developed in plaintiffs' answers to interrogatories, depositions, or expert disclosure. The trial justice denied the motion, concluding that it was a legitimate area of interest in the case, and she therefore permitted testimony from plaintiffs' ex-

pert, Dr. Schneider, about Atwood's on-call coverage system. After the close of all the evidence, Atwood moved for judgment as a matter of law with respect to the claim of direct liability against Atwood for its on-call coverage system, or lack thereof. After considerable argument by counsel, the trial justice granted the motion. She was terse in her decision and gave no reason other than saying, "the Court is not satisfied that there has been sufficient testimony upon which the jury could make a reasoned conclusion one way or the other."

## Jury Instruction Relating to Interns and Residents at Roger Williams

Before the jury began its deliberation, plaintiffs requested a jury instruction based on the negligence of interns and residents at Roger Williams. In plaintiffs' complaint, they had alleged that Roger Williams, by and though its agents and employees, was negligent in its diagnosis, treatment, and care of Gianquitti. In line with this theory of negligence, plaintiffs submitted the following proposed instruction:

> "You are instructed as a matter of law that on December 23, 2000 physicians who are interns and residents under the circumstances attendant to Mr. Gianquitti's condition had a duty, if as a matter of fact you find that the interns and residents observed Mr. Gianquitti's priapism, to report that condition to Mr. Gianquitti's attending physician or other medical and/or supervisory staff. If you find that interns or residents at Roger Williams Medical Center examined Plaintiff Kenneth J. Gianquitti on December 23, 2000 and failed to report his

---

8. Doctor Goldstein also said that some people escape permanent damage even if treatment is delayed beyond twelve hours. He conceded that there was one medical study that concluded that if a priapism is treated within twenty-four hours, there is a 90–percent chance that the patient will recover potency.

condition to a physician who was competent to evaluate and treat the Plaintiff, and the proper diagnosis and treatment would have prevented the injuries suffered by Mr. Gianquitti either in whole or in part, then you must find that these individuals' negligence was a proximate cause of those injuries which could have been prevented, and you must find that Defendant Roger Williams Medical Center was negligent."

During the trial, plaintiffs' counsel had sought to question Dr. Schneider on the standard of care applicable to interns and residents under the circumstances presented in the case. The trial justice ruled that Dr. Schneider could not testify about the interns and residents because the pretrial depositions had been exhaustive and none of the experts had criticized the acts or omissions of any intern or resident. At that point, plaintiffs' counsel asked the trial justice whether she would be amenable to charge the jury with regard to the interns and residents based on the evidence submitted at trial, but the trial justice reserved her decision on whether or not to so charge the jury.

After closing arguments, plaintiffs' counsel objected to the court's refusal to give an instruction on the interns and residents. He argued that the jury should have been instructed that if the residents or interns observed plaintiff's condition, then a duty attached. He asserted that there was uncontradicted testimony that the nurses had a duty to report the priapism, and that therefore, residents and interns, because they are physicians, could not be held to a lesser duty than nurses to report the condition. The trial justice, however, was not swayed. When she delivered the charge, she instructed the jury on the standard of care for physicians and nurses, but she did not impart the requested instruction about interns and residents.[9]

### Analysis

To support their appeal, plaintiffs press two issues. They argue that the trial justice committed reversible error when she granted Atwood's motion for judgment as a matter of law on plaintiffs' direct claim of negligence against Atwood for its on-call procedures and lack of adequate coverage. The plaintiffs also assert that the trial justice committed reversible error when she refused to give an instruction to the jury relating to the duty of the interns and residents at Roger Williams. The defendant, Atwood, counters that the trial justice properly granted its Rule 50 motion because plaintiffs failed to present any evidence that Atwood breached its duty of care by failing to have an adequate backup system for its on-call physicians and failed to demonstrate that any such breach was the proximate cause of the patient's injuries. The defendant, Roger Williams, responds that there was no basis in the evidence from which to provide the requested instruction concerning the interns and residents. We address these discrete issues below.

### I

### Grant of Atwood's Rule 50 Motion

### A

### Standard of Review

■■■ Our review of a trial justice's decision on a motion for judgment as a matter of law is *de novo*. *Franco v. Latina*, 916 A.2d 1251, 1258 (R.I.2007) (citing *Pezzuco Construction, Inc. v. Melrose As-*

9. After the trial justice completed the charge, plaintiffs' counsel renewed his request that the jury be charged on the issue of intern and resident duty of care and incorporated the arguments he had made earlier.

*sociates, L.P.*, 764 A.2d 174, 177 (R.I. 2001)). For that reason, we "review the entry of judgment as a matter of law by applying the same standard as the trial justice, 'consider[ing] the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw[ing] from the record all reasonable inferences that support the position of the nonmoving party.'" *Calise v. Curtin*, 900 A.2d 1164, 1167–68 (R.I.2006) (quoting *Tedesco v. Connors*, 871 A.2d 920, 927 (R.I.2005)). Rule 50(a)(1) provides:

> "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

 The trial justice may grant a Rule 50(a)(1) motion "if, after viewing the evidence in the light most favorable to the nonmoving party, she determines that the nonmoving party has not presented legally sufficient evidence to allow the trier of fact to arrive at a verdict in his favor." *Franco*, 916 A.2d at 1259. On the other hand, "[i]f there is evidence supporting the nonmoving party or evidence on which reasonable minds can differ, the jury is entitled to decide the facts and the motion should be denied." *Lutz Engineering Co. v. Industrial Louvers, Inc.*, 585 A.2d 631, 635 (R.I.1991). Therefore, we will reverse a trial justice's grant of a motion for judgment as a matter of law when the trial justice has "invaded the province of the jury" by impermissibly finding facts, *Hanson v. Singsen*, 898 A.2d 1244, 1248 (R.I. 2006), or "by weighing the evidence and accessing the credibility of witnesses," *Franco*, 916 A.2d at 1259.

## B

### Discussion

 The plaintiffs argue that they presented sufficient evidence through the testimony of Dr. Schneider and Dr. Goldstein to allow the jury to consider their claim that Atwood was negligent, and that as a result of that negligence, Gianquitti was injured. Atwood counters that Dr. Schneider's testimony was insufficient to establish a standard of care, that there was no evidence of a breach because Atwood had a backup system in place, and that any failure of a backup system was not the proximate cause of plaintiff's injury. We have considered the evidence in the light most favorable to plaintiffs without weighing the credibility of the witnesses, and have drawn all reasonable inferences in favor of plaintiffs' position. After doing so, we hold that plaintiffs presented sufficient evidence at trial on its theory of Atwood's direct liability and that the trial justice erred when she granted Atwood's motion for judgment as a matter of law.[10]

---

10. Although today we hold that plaintiff submitted sufficient evidence as a matter of proof, our holding does not address whether, as a matter of law, Atwood owed a duty to Gianquitti under the facts and circumstances of this case. This Court has not had occasion to recognize the duty of a physicians' practice group, such as Atwood, under a theory of direct negligence, also known as corporate negligence, to adopt policies and procedures to ensure adequate and timely care for its physicians' patients. *See generally Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703, 707–08 (1991) (listing four theories of corporate negligence); *see also Rodrigues v. Miriam Hospital*, 623 A.2d 456, 463 (R.I.1993) (adopting theory of corporate negligence as applied to hospitals as extension of negligent-hiring

## 1

### Evidence of the Standard of Care

■ We do not accept Atwood's argument that plaintiffs failed to offer sufficient expert testimony to establish the standard of care for a professional medical-group practice, such as Atwood, that provides on-call medical care to its patients if and when they are hospitalized. Doctor Schneider articulated that the standard of care required that Atwood have a formal backup system in place so that a physician who is on call for the group, such as Dr. Warshaw in this instance, may call upon other doctors within the group for assistance in the event of a large number of calls or other unforeseen circumstances and emergencies so patients do not go without adequate and timely care. In our opinion, Dr. Schneider adequately established the standard of care that governed the alleged duty Atwood owed to Gianquitti, and whether to accept or reject his opinion was up to the jury.

Over defendant's objection, the trial justice permitted Dr. Schneider to testify about his opinion on the standard of care that applied to Atwood, and also that Atwood deviated from that standard by failing to have a backup system in place. Atwood, however, argues that Dr. Schneider was not credible because he was a "retired solo practitioner turned lawyer" and that he was not presented as an expert. It is well settled that it is improper to evaluate a witness's credibility on a review of a Rule 50 motion, *Calise*, 900 A.2d at 1167–68; therefore, we decline to disturb the trial justice's ruling based on plaintiffs' assessment of the credibility of defendant's expert.

■ Further, the trial justice acted within her discretion to allow Dr. Schneider to give expert testimony about the standard of care for providing on-call coverage. *See Franco*, 916 A.2d at 1260 ("the decision to allow an expert opinion is within the sound discretion of the trial justice and will be disturbed only for an abuse of that discretion"). "Any doctor with knowledge of or familiarity with the procedure, acquired through experience, observation, association, or education, is compe-

theory); *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill.2d 278, 246 Ill.Dec. 654, 730 N.E.2d 1119, 1128 (2000) (holding doctrine of institutional negligence may be applied to HMOs); *Gafner v. Down East Community Hospital*, 735 A.2d 969, 979 (Me.1999) (declining to create corporate liability cause of action against hospitals for failing to have policies controlling actions of physicians). The issue was not properly articulated below, and it has not been either briefed or argued before this Court. We acknowledge that whether there is a duty owed in a particular case is a question of law for the court to decide, *Bucki v. Hawkins*, 914 A.2d 491, 495 (R.I.2007), that a "defendant cannot be liable under a theory of negligence unless it owes a duty of care to the plaintiff," *Tavares ex rel. Guiterrez v. Barbour*, 790 A.2d 1110, 1112 (R.I.2002) (quoting *Volpe v. Fleet National Bank*, 710 A.2d 661, 663 (R.I.1998)), and that our review is *de novo*. However, we also strongly adhere to our well-settled raise-or-

waive rules. *See Warwick Housing Authority v. McLeod*, 913 A.2d 1033, 1037 (R.I.2007) ("arguments not made before the Superior Court are deemed waived, under our well-settled 'raise or waive' rule, and will not be considered by this Court"); *Stebbins v. Wells*, 818 A.2d 711, 720 (R.I.2003) ("The failure of a party to challenge a trial court's ruling or to brief a particular issue on appeal results in a waiver of that issue."); *Cavanaugh v. Palange*, 111 R.I. 680, 684, 306 A.2d 182, 184–85 (1973) (refusing to pass on issue of police officer's immunity from civil suit when Court had never before addressed the issue and the plaintiff had failed to address the issue on appeal); *see also* Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure ("Errors not claimed, questions not raised and points not made ordinarily will be treated as waived and not be considered by the Court"). Therefore, we decline to address this issue because it is not properly before the Court.

tent to testify concerning the requisite standard of care and whether the care in any given case deviated from that standard." *Sheeley v. Memorial Hospital,* 710 A.2d 161, 166 (R.I.1998). Doctor Schneider was a physician who specialized in internal medicine and who testified that he had experience practicing within a group of physicians that would set up policies and practices for providing coverage for themselves during vacations and weekends. He gave the basis for his opinions, and they were properly elicited at trial through a series of hypothetical questions predicated on facts that were in evidence. *See* R.I. R.Evid. 703 ("[a]n expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence").

### 2

### Evidence of Atwood's Deviation from the Standard of Care

■ In our opinion, plaintiffs met their burden of presenting sufficient evidence upon which a reasonable jury could conclude that Atwood deviated from the standard of care by failing to have a formal backup system in place. Both Dr. Gordon and Dr. Warshaw said that there was no backup system in place that would have allowed an attending physician to call on another internist for assistance during the Christmas weekend of December 2000. Doctor Schneider testified that assuming Atwood did not have a backup system in place in which Dr. Warshaw could look to other internists within the group to assist him while he was on call on December 22 and 23, 2000, then Atwood deviated from the standard of care.

Pointing to Dr. Warshaw's testimony, Atwood asserts that there was no breach of any duty because Dr. Schneider's opinion was fallacious and based on the inaccu-

rate assumption that Atwood lacked a backup system. However, in our opinion, there was sufficient evidence in the record to support the assertion that Atwood lacked a backup system. Although it is true that Dr. Warshaw testified that Atwood had a backup system in place, that arrangement covered only patients experiencing a heart attack or who were in critical care; it did not address situations requiring the attention of an internist, the exact standard of care to which Dr. Schneider testified.

### 3

### Evidence of Causation

■ Atwood argues that Dr. Warshaw never specifically testified that the lack of any backup system influenced his decisions in treating Gianquitti. We acknowledge the merit of this argument and recognize that plaintiffs did not provide direct evidence of causation, but rather, evidence that was circumstantial in nature and that relied on numerous inferences. Although it is true that "proximate cause may not be established by conjecture or speculation;" it is also well settled that " 'proximate cause can be established by circumstantial evidence, and specific direct evidence of * * * proximate cause is not always necessary.' " *Seide v. State,* 875 A.2d 1259, 1268–69 (R.I.2005) (quoting *Martinelli v. Hopkins,* 787 A.2d 1158, 1169 (R.I.2001)).

■ "Causation is proved by inference." *Seide,* 875 A.2d at 1269 (quoting *Cartier v. State,* 420 A.2d 843, 848 (R.I. 1980)). "However, [a] plaintiff 'is not required to demonstrate with absolute certainty each precise step in the causal chain between the tortfeasor's breach of duty and the injury.' " *Id.* (quoting *Skaling v. Aetna Insurance Co.,* 742 A.2d 282, 288 (R.I.1999)). In other words, "[w]hen inference is employed to establish causation,

'[p]roof by inference need not exclude every other possible cause, * * * it must be based on reasonable inferences drawn from the facts in evidence.'" *Id.* at 1268–69 (quoting *Martinelli*, 787 A.2d at 1169 and *McLaughlin v. Moura*, 754 A.2d 95, 98 (R.I.2000)).

■ "In malpractice suits where the negligence complained of consists of an act of omission, as in the instant case, causation is frequently difficult to ascertain and prove." *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 517, 382 A.2d 514, 518 (1977). It is critical to our analysis that Rule 50 requires that all evidence be viewed in the light most favorable to the plaintiff and that all reasonable inferences of proximate cause must be made in the plaintiff's favor. *Seide*, 875 A.2d at 1268–69. "The true rule is that what is proximate cause of an injury is ordinarily a question for the jury." *Schenck*, 119 R.I. at 517, 382 A.2d at 518 (quoting *Mayor & City Council v. Terio*, 147 Md. 330, 128 A. 353, 355 (1925)).

■ In our opinion, plaintiffs' evidence was sufficient to enable a reasonable jury to conclude that Atwood's breach, if the jury so found, was a proximate cause of Gianquitti's injury. Doctor Warshaw testified that "but for" his duties on the morning of December 23, 2000, to attend to the critical care patients at Fatima first, he would have been available to examine Gianquitti earlier that morning. He said that it was his standard practice to visit his newly admitted patients within a few hours of admission and that he customarily rounded on his patients in the morning.

He said that he could not visit plaintiff on the morning of December 23, 2000 because he was serving as the on-call physician for the group and had approximately twenty patients to care for at another hospital, some of whom were critically ill. He said it was very busy that weekend, so he did not have time to devote to taking calls from or supervising interns or residents, which was his principal reason for admitting Gianquitti as a nonteaching patient. He said that if he had been able to go to Roger Williams at 7 or 8 that morning, he would have examined the patient and made a diagnosis and he would have begun efforts to treat him.[11] Most importantly, he would have contacted a urologist. Doctor Goldstein testified, to a reasonable degree of medical certainty, that if Gianquitti had been treated before noon on December 23, 2000, he would not have suffered a permanent injury. Because Dr. Warshaw was so busy that weekend and admitted that his duties prevented him from caring for his patients in his usual and customary manner, there was sufficient testimony to allow the jury to infer that he would have called for backup if it had been available, and that this would have ensured that Gianquitti was treated by an internist the morning after his admission. Based on this, a reasonable jury could conclude that Gianquitti would have been treated in time to avoid permanent injury, and therefore that the lack of an adequate backup system caused or contributed to his injury. We hold, under the circumstances presented to us on appeal, that the trial justice erred when she granted Atwood's motion for judgment as a matter of law.

11. In its brief, Atwood urges that Dr. Warshaw testified that, "he had no need of any back-up in order to timely respond to Gianquitti's priapism." Atwood mischaracterizes the doctor's testimony. The doctor said that he did not "consider" calling any of the internists from his group for backup on December 23, 2000. However, the evidence established that there was no system in place that would ensure that he could obtain such backup, even if he tried. Therefore, we do not believe that the doctor's failure to *consider* calling for backup is evidence that he did not *need* backup.

## II

### Refusal to Give Jury Instruction

▪ The plaintiffs contend that the trial justice improperly denied their request for a specific instruction that if interns and residents of Roger Williams observed the patient's priapism, then they had a duty under the circumstances to report the patient's condition, and if they failed to report the condition, and that failure prevented the patient from receiving proper treatment that would have prevented the injury, then the jury must find that Roger Williams was negligent. "General Laws 1956 § 8-2-38 requires the trial justice to instruct the jury on the law to be applied to the issues raised by the parties." *Malinowski v. United Parcel Service, Inc.*, 792 A.2d 50, 55 (R.I.2002) (quoting *State v. Briggs*, 787 A.2d 479, 486 (R.I.2001) and *State v. Lynch*, 770 A.2d 840, 846 (R.I. 2001)). However, "[i]t is well settled that the charge given to the jury must be applicable to the facts that have been adduced in evidence and that a request for instructions is properly denied when there is no basis for such instruction in the evidence." *Brodeur v. Desrosiers*, 505 A.2d 418, 422 (R.I.1986) (citing *Labrecque v. Branton Yachts Corp.*, 457 A.2d 617, 619 (R.I.1983)). In this case, plaintiffs maintain that they presented sufficient evidence to establish that interns and/or residents at Roger Williams were negligent, and therefore,

the hospital, as their employer, was vicariously liable to plaintiffs. This argument requires us to determine whether the record contains sufficient evidence from which a reasonable jury could reach the conclusion set forth in the requested instruction, that the alleged interns and/or residents had a duty and were negligent by failing to report the patient's priapism. After a review of the record, we conclude that the record lacks evidentiary support to warrant plaintiffs' theory of negligence based on the acts or omissions of hospital interns or residents, and therefore, the trial justice did not err when she refused to give the jury the proposed instruction.[12]

▪ The plaintiffs failed to present any expert testimony that would support the requested instruction that the interns, in particular, had a duty to report the priapism under the circumstances present in this case. Indeed, plaintiffs did not present expert testimony on any standard of care that the interns failed to meet.[13] In a medical malpractice action, the plaintiff must establish a standard of care applicable to the defendant and the defendant's deviation from that standard through the use of expert testimony, unless the breach of a duty of care would be obvious to a lay person. *Boccasile v. Cajun Music Ltd.*, 694 A.2d 686, 689–90 (R.I.1997); *see also Riley v. Stone*, 900 A.2d 1087, 1095 (R.I. 2006); *Sheeley*, 710 A.2d at 164.[14] "Expert

---

12. As an initial matter, we recognize that there was sufficient evidence that would justify a jury's conclusion that interns examined the patient. The record reveals that Gianquitti testified that two young doctors, who he believed were interns, visited him between 7 and 8 a.m. on December 23, 2000. Although Gianquitti admitted that he did not know the basis for his assumption that the doctors were interns, it is for the jury to decide how much weight to give this evidence.

13. The trial justice precluded Dr. Schneider from giving testimony on the interns' standard of care because those issues were not

developed during pretrial discovery. The plaintiffs have not appealed from the trial justice's ruling in this regard, and we, therefore, decline to address its merits. The record reflects that Roger Williams provided plaintiffs with the names of the interns who could have been at the hospital on December 23, 2000. The plaintiffs never deposed any of the disclosed interns nor did they call any resident or intern to testify at trial.

14. In this case, although the interns were not named defendants, plaintiffs were required to submit evidence of their negligence in support

testimony is needed to explain \* \* \* *what proper procedures and alternatives are available* to a physician \* \* \* [and] to show why the procedures followed by the defendant physician were negligent, *and not legitimate,* alternatives." *Sousa v. Chaset,* 519 A.2d 1132, 1135 (R.I.1987). In our opinion, specific expert testimony was required to adequately present the issue to the jury because the alleged negligence of the interns was not the type of negligence that would be obvious to a layperson. *Cf. Foley v. St. Joseph Health Services of Rhode Island,* 899 A.2d 1271, 1278 (R.I. 2006) (holding expert testimony required in medical malpractice action against radiologist for five hour delay in reporting results of emergency room patient's CT scan); *Boccasile,* 694 A.2d at 690–91 (requiring expert testimony when alleged negligence of nurse in responding inadequately to a medical emergency involves professional skill and judgment of nurse). The plaintiffs' theory was based on negligent observation and reporting of a medical condition that involves an intern's professional skill and judgment. A layperson cannot be expected to know what is expected of an intern who checks on a non-teaching patient in a hospital.

■ The plaintiffs argue, however, that the testimony of the nurses and nursing expert, together with the testimony of the doctors, including Dr. Warshaw, Dr. Rote, and plaintiffs' experts, Dr. Schneider and Dr. Goldstein, collectively provided sufficient evidence of an applicable standard of care. They maintain that a reasonable jury could have found that the alleged interns were negligent based on the assumption that they should have communicated something about the patient's condition in a timely manner. The plaintiffs argue that interns and residents are held to the same standard of care as doctors,

see *Baccari v. Donat,* 741 A.2d 262, 264 (R.I.1999) ("In this jurisdiction residents are held to the same duty of care as other physicians."); therefore, they maintain that the testimony of the other physicians presented relevant evidence on the standard of care for the interns and residents. For the following reasons, we decline plaintiffs' invitation to cobble together a standard of care from this testimony.

■ Although in *Baccari,* 741 A.2d at 264, this Court said that residents are held to the same general standard of care as physicians and are not held to a lesser standard, that holding did not define or address an intern's or resident's duties under the circumstances present in a particular case. *Cf. Cornfeldt v. Tongen,* 262 N.W.2d 684, 694–95 (Minn.1977) (holding trial court properly excluded expert's testimony that the accepted medical practice required a resident to review preoperative test results because the expert lacked knowledge of the requirements of the resident in his first stage of residency). In general, "we hold physicians to a duty of care that is expected of a reasonably competent practitioner *acting under similar circumstances.*" *Oliveira v. Jacobson,* 846 A.2d 822, 826 (R.I.2004) (citing *Sheeley,* 710 A.2d at 167) (emphasis added) (holding defendants could not rely on the standard of care of a non-defendant doctor to establish the standard of care applicable to the defendant doctor because they did not operate under similar circumstances).

The testimony of Dr. Warshaw and Dr. Schneider focused on the standard of care for an on-call attending physician who is responsible for diagnosing and treating admitted patients and who learns that a patient has been experiencing a persistent erection. On the other hand, the testimony of Dr. Rote and Dr. Goldstein con-

of their theory of vicarious liability of defendant Roger Williams.

cerned only the standard of care for a urologist who is treating a patient who has been experiencing a persistent erection. Nothing from the testimony of these doctors established what the unidentified interns were expected to do when they saw Gianquitti, a nonteaching patient whom they were not authorized to treat. Because the interns (accepting the patient's testimony that interns visited him) were operating under different circumstances from the physicians and had duties different from those of the other physicians, it is our opinion that the testimony of the physicians did not support an instruction on the standard of care for the interns. There simply is nothing in the record that would establish what the alleged interns should have done in these circumstances. No evidence was presented about whom the interns should have notified, what steps they should have taken in the circumstances, or what they could have done despite any limitations that they may have had upon their authority.

The plaintiffs also ask us to rely on the testimony relating to nurses to establish the standard of care for the interns. Catherine Graziano, a retired nurse who testified as an expert, said if a nurse had assumed the responsibility to monitor an admitted patient and the patient complained of a persistent erection, the nurse should ask the patient questions and investigate the condition. She explained that if a nurse found out that the erection persisted over two hours or more, it would be the nurse's obligation to notify the attending physician. In addition, Nurse Bousquet testified that if she had found out that the patient was experiencing a priapism, she would have considered it her responsibility, as a nurse, to call the attending physician. Similarly, Nurse Lemoi–Brown testified that even though she did not consider a priapism to be of an emergency nature, she understood that urgent medical care was required.

In our opinion, plaintiffs cannot rely on the testimony about the standard of care for nurses to establish the standard of care for the interns. None of the nurses testified about the standard of care for the interns and residents at Roger Williams. Rather, the nurses testified about what the nurses should have done when presented with a patient for whom they are responsible who is experiencing a persistent erection, not what a physician who is an intern should do under those circumstances.

■ Furthermore, none of the nurses testified that the standard of care for *intern physicians* under the circumstances was within their knowledge, skill, training, or experience. It is well settled that the expert witness must have "knowledge, skill, training, or experience in the same field as the alleged malpractice so that the expert's testimony can be genuinely helpful to the jury." *Debar v. Women and Infants Hospital,* 762 A.2d 1182, 1188 (R.I. 2000) (quoting *Marshall v. Medical Associates of Rhode Island, Inc.,* 677 A.2d 425, 427 (R.I.1996)). Therefore, the testimony of the nurses could not have provided the jury with evidence from which it could reasonably conclude that any interns or residents were negligent.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court in favor of Roger Williams Medical Center, and we vacate the judgment entered as a matter of law in favor of Atwood Medical Associates, Ltd. and remand the case for a new trial. The papers in this case may be remanded to the Superior Court for further proceedings consistent with this opinion.