**Michael MEDEIROS**

v.

**Laura SITRIN et al.**

**No. 2008–278–Appeal.**

Supreme Court of Rhode Island.

Dec. 11, 2009.

---

Kathleen Managhan, Esq., Newport, for Plaintiff.

Marc DeSisto, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Before this Court is an appeal by Michael Medeiros from a judgment as a matter of law entered in the Superior Court in favor of the defendants, Ronald Ford and the City of Newport. This case came before the Supreme Court for oral argument on November 3, 2009, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the parties' arguments and considering the memoranda submitted by counsel, we are satisfied that cause has not been shown, and we proceed to decide this appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

Medeiros fractured his ankle on February 1, 2002, when he was a twelfth-grade student at Rogers High School in Newport. The injury occurred after Medeiros's tardy arrival to his Marine Occupations class, which was taught by defendant Ronald Ford.[1] The Marine Occupations class prepares students in a variety of endeavors, including boat building and painting, welding, and fisheries. Because the class has a practical component as well as traditional instruction, it is taught in both a classroom and an adjoining laboratory (lab) in which the students receive hands-on training in boat building and servicing. Instruction first began in the class, but to enter the classroom, students were required to first pass through the lab. The opening between the classroom and lab had no door, facilitating passage between the two rooms. Ford's practice was to position himself near the entrance to the lab from the outside before his class was to begin. This allowed him to "monitor" the students coming into the Marine Occupations class and also to observe the students as they passed to their next classes.

When it was time for this class to begin, Ford would look outside for any lingering students. He and the students in the lab would wait for any final students to enter and then they would all proceed directly from the lab to the adjoining classroom as Ford followed behind. Once in the classroom, Ford would take attendance and distribute any materials. He would also visually assess the students to determine whether any looked ill or appeared to be under the influence of drugs or alcohol and therefore not physically capable of working with equipment in the lab. Ford performed these duties from his desk within the classroom. From that vantage point, he had "limited" visibility into the lab and

1. Ford retired in 2003.

could not see its entrance. Because he lacked a view of the door connecting the lab to the outside, Ford purposely never oiled or greased the door, which had an audible squeak that alerted him when the door was opened, possibly by a tardy student.

On February 1, 2002, Ford, in keeping with his typical classroom practices, waited a few seconds after the bell for late students and then accompanied his students into the classroom. Approximately a minute and a half after the class period commenced, Ford had "pretty much" completed taking attendance. As he distributed information and forms to the students in the classroom, he "heard a very[,] very loud crash and a bang" as the lab door opened. He then "heard a commotion that sounded like people were moving at a rapid rate" for two to three seconds; this was followed immediately by a "crashing sound." Ford left the classroom immediately and went into the lab, where he saw Medeiros lying on the ground.[2] After promptly summoning the school nurse, Ford observed two of his students in the lab who had not been in the classroom: Brandon Burd and Jared Carlton. Ford had never before encountered any disciplinary issues with either of them.

Medeiros had arrived late to Marine Occupations class that day because, before he proceeded to class, he picked up his paycheck for an after-school job coordinated through the school.[3] This was not the first time Medeiros had been late to class after retrieving his paycheck. Ford had discussed Medeiros's tardiness with him, and he had never given him permission to be late.

Medeiros said that he entered the classroom through the lab door and when he opened the door it squeaked but then crashed against the building because of the wind. As soon as he entered the lab, he saw two students, Burd and Carlton, at their lockers. Medeiros said that he had problems with Carlton in the past when Carlton "picked on" him. According to Medeiros, Burd "grabbed [his] paycheck out of [his] hand." He attempted to retrieve the check from Burd, but Carlton "jumped on [his] back." Medeiros attempted to hold on to a workbench but lost his balance and fell into a sawhorse. When he tried to get up from the floor, he realized that his foot was "pointing at a 90–degree angle" to his leg. About five seconds elapsed from the time Medeiros entered the lab until he fell to the floor. The school nurse came to Medeiros's assistance.[4]

Emergency vehicles transported Medeiros to the hospital. There, an emergency room physician diagnosed Medeiros's injury as a fracture and dislocation of his ankle. Four days after the initial injury, Medeiros underwent a procedure to place "a steel plate and several screws" in his ankle so that, according to Medeiros, it would "heal straight."

2. Ford had the class accompany him to the lab because he didn't "want them to be in the classroom alone."

3. Medeiros picked up his paycheck at the main office every two weeks since November of 2001. It took him ten minutes to do so and he also purposely walked slowly on his way from the office to class to minimize the amount of time that he spent in class.

4. Medeiros's father, Manuel Medeiros, is a police officer for the City of Newport, and was working the day of his son's accident. He received a call that his son had been injured at school and he then went to the high school. According to Officer Medeiros, Ford told him "[t]hat this type of behavior had happened before; he was surprised that something like that had not happened sooner."

On October 8, 2004, Medeiros filed suit against defendants, Ford and the City of Newport. In count 1 of his complaint, plaintiff alleged that Ford and the City of Newport owed him "a duty of reasonable care in the supervision of students within their charge," that they breached that duty to exercise reasonable care, and that the breach was the proximate cause of plaintiff's injury. In count 2, plaintiff alleged that the City of Newport had "a duty to exercise a reasonable degree of care in the hiring, training and supervision" of Ford, that it breached this duty, and that this breach proximately caused plaintiff's injury. A jury trial was held in Superior Court on April 28 and 29, 2008.

After plaintiff rested, defendants moved for a judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure. The trial justice granted the motion for judgment as a matter of law on count 2 after the parties agreed that no evidence had been presented on that count. As for the sole remaining count, defendants maintained that plaintiff had established neither a standard of care beyond a general duty of reasonable supervision nor Ford's deviation from even that standard. The plaintiff argued that Ford had a "duty to supervise students within his charge" as established through Ford's testimony and the direction in the Teacher's Handbook that "[s]tudents must be supervised at all times." The plaintiff contended that Ford therefore had a duty to supervise foreseeably late students who would have to travel through the lab to reach the classroom. The plaintiff further argued that Ford breached this duty because he was not present in the lab and was therefore unable to supervise Medeiros's late arrival in class on the day of his injury. Also, plaintiff argued that Ford's breach of the duty to supervise was the proximate cause of Medeiros's injury because it was foreseeable that students

would be entering the lab and "could get into some horseplay and someone could get injured."

The trial justice granted the motion. He found that there were "no * * * factual issues upon which reasonable persons might draw different conclusions." The trial justice also found that Ford's testimony as to his classroom practices was "clear cut" and "uncontradicted." The trial justice held that Ford did not have a duty to supervise "at all times while he was doing different functions that must be performed by him," such as fulfilling his obligation to take attendance. He determined that Ford was aware of his duty to supervise and that there was no evidence "that he was abrogating that duty." Additionally, the trial justice determined that Ford could not have "anticipated" the incident that occurred among the three boys within a five-second time span. Therefore, the trial justice ruled that Ford did not breach his duty to supervise his students. Medeiros timely appealed.

## II

## Analysis

The sole issue on appeal is whether the trial justice erred when he granted defendants' motion for judgment as a matter of law rather than submitting the case to the jury. The plaintiff argues that the jury could have assessed liability to Ford if it found he had breached his duty to supervise his students due to his absence from the lab when the incident that resulted in plaintiff's injury took place. He argues that expert testimony was not necessary, because a teacher's duty to supervise and the breach thereof are matters within the common knowledge of the jury. Finally, plaintiff contends that a jury could find that Ford's breach of his duty to supervise was the proximate cause of Medeiros's in-

jury, rather than the acts of Burd and Carlton, because a ruckus among the tardy students in the lab while Ford was in the classroom was reasonably foreseeable to him.

## A

### Standard of Review

■■ Our review of a trial justice's decision on a motion for judgment as a matter of law is *de novo*. *Gianquitti v. Atwood Medical Associates, Ltd.*, 973 A.2d 580, 589 (R.I.2009) (citing *Franco v. Latina*, 916 A.2d 1251, 1258 (R.I.2007)). Therefore, "[t]his Court, like the trial justice, will examine 'the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party.'" *Oliveira v. Jacobson*, 846 A.2d 822, 829 (R.I.2004) (quoting *Estate of Fontes v. Salomone*, 824 A.2d 433, 437 (R.I.2003)). Rule 50(a)(1) provides:

> "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

■■ Accordingly, the trial justice may grant a Rule 50(a)(1) motion "if, after viewing the evidence in the light most favorable to the nonmoving party, she determines that the nonmoving party has not presented legally sufficient evidence to allow the trier of fact to arrive at a verdict in his favor." *Gianquitti*, 973 A.2d at 589 (quoting *Franco*, 916 A.2d at 1259). How-

ever, the trial justice must deny the motion and submit the issues to the jury if there are factual issues on which reasonable people may draw different conclusions. *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I.1996).

## B

### Discussion

■■ To maintain a cause of action for negligence, the plaintiff must establish four elements: (1) a legally cognizable duty owed by defendant to plaintiff; (2) breach of that duty; (3) that the conduct proximately caused the injury; and (4) actual loss or damage. *Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 658 (R.I. 2009) (citing *Willis v. Omar*, 954 A.2d 126, 129 (R.I.2008)). A plaintiff who asserts a cause of action based on negligence has the burden to "establish a standard of care and prove, by a preponderance of the evidence, that the defendant deviated from that standard of care." *Riley v. Stone*, 900 A.2d 1087, 1095 (R.I.2006) (citing *Morales v. Town of Johnston*, 895 A.2d 721, 732 (R.I.2006)). We have examined the evidence in the light most favorable to plaintiff and have drawn all reasonable inferences that support his claim. After doing so, we are of the view that, although Ford had a duty to supervise his students, plaintiff did not offer legally sufficient evidence that Ford breached this duty and, therefore, a reasonable jury could not find for plaintiff on the issue of negligence. As a result of the dearth of evidence to support an essential element of a cause of action for negligence, breach of a legally cognizable duty, we hold that the trial justice properly entered judgment as a matter of law in favor of defendants.

### 1

### Duty to Supervise

The plaintiff argues that Ford had a duty of "[c]onstant supervision" of the stu-

dents and was required "to remain" with them. The plaintiff asserts that this duty is established by G.L.1956 § 16–2–17, which provides that students have "a right to attend * * * a school which is safe and secure, and which is conducive to learning, and which is free from the threat, actual or implied, of physical harm by a disruptive student" and by the Rogers High School Teacher's Handbook, which directs teachers to supervise students "at all times." The plaintiff further directs our attention to case law from other jurisdictions, requiring schools and their faculties to exercise the care " 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances' " when they supervise students. *Dailey v. Los Angeles Unified School District,* 2 Cal.3d 741, 87 Cal.Rptr. 376, 470 P.2d 360, 363 (1970); *see also Wyke v. Polk County School Board,* 129 F.3d 560, 571 (11th Cir.1997); *Roberson v. Duval County School Board,* 618 So.2d 360, 362 (Fla.Dist.Ct.App.1993); *Collins v. School Board of Broward County,* 471 So.2d 560, 564 (Fla.Dist.Ct.App.1985); *Eisel v. Board of Education of Montgomery County,* 324 Md. 376, 597 A.2d 447, 451–52 (1991). The defendants concede that Ford had a duty to supervise his students. Indeed, Ford testified that he was responsible for supervising the students in his class.[5] Therefore, for the purposes of this appeal, we will assume, without deciding, that Ford had a duty to supervise Medeiros, Burd, and Carlton under the particular facts in this case.

### 2
### Evidence of Ford's Deviation from the Standard of Care

■ The defendants argue that plaintiff failed to present evidence establishing that Ford breached his duty to supervise. The defendants assert that expert testimony was necessary because Ford's teaching environment encompassed two adjoining rooms, one of which contained "potentially dangerous equipment" and was "a situation unique even for every day teachers, let alone the typical juror." The defendants argue that Ford's teaching situation further departed from the "regular classroom setting" because it was imperative that Ford assess the students' fitness to work with the dangerous equipment prior to allowing them to leave the classroom and enter the lab. Conversely, plaintiff asserts that expert testimony is unnecessary to establish either a standard of care or a deviation therefrom, because the jury may apply its "common knowledge and experience" to determine whether Ford breached his duty to supervise his students.

After carefully reviewing the record, including Ford's uncontradicted testimony about his classroom practices, it is our view that plaintiff failed to demonstrate in any way that Ford breached his duty of supervision. Although the handbook specifies the requirement that teachers must supervise the students "at all times," plaintiff did not establish "a specific act or omission [of Ford] that indicated a deviation from the proper standard of care."

---

**5.** "Q: * * * Now, you agree that as a teacher at Rogers High School, that you had a role in supervising students?

"A: Yes.

"* * * *

"Q: * * * So do you agree that your supervisory role over students in the marine occupations class extends to both students in the classroom and students in the laboratory?

"A: Providing that they come in when they're supposed to come in.

"* * *

"* * * my role in the laboratory upon entrance is as soon as they come in I'm responsible for their everything."

*Morales*, 895 A.2d at 732. For example, plaintiff did not offer any evidence about whether a teacher's duty of supervision "at all times" requires the teacher's constant physical presence with each student, as plaintiff suggests. Indeed, even the case law from other jurisdictions that plaintiff cites to support the proposed standard of care for teachers in supervising their students does not contemplate that a teacher's physical absence from a student is necessarily a breach of the duty to supervise. *See Collins*, 471 So.2d at 564 (quoting *Cirillo v. City of Milwaukee*, 34 Wis.2d 705, 150 N.W.2d 460, 465 (1967)) (enumerating factors to consider when determining whether a teacher exercised "reasonable care" when supervising students, the fifth of which is "the reason for and duration of the teacher's absence").

Additionally, plaintiff failed to offer any evidence about the supervisory expectations of teachers over late students, particularly in consideration of the unique nature of Ford's duties and teaching environment in a shop-style class held in both a classroom and an adjoining lab, or of Ford's deviation from the standard of care expected of teachers in such situations. *Morales*, 895 A.2d at 732. Although Officer Medeiros testified that Ford told him after the incident that he was surprised that it had not happened sooner, there was no evidence to suggest that Ford knew or should have known that the three students were in the laboratory at that particular moment. Indeed, Ford testified that "[i]f they came in the door unannounced late intentionally, how would I know they were there?" Therefore, the handbook's unclarified and somewhat aspirational directive to teachers to supervise students "at all times" and Ford's uncontradicted testimony as to his long-standing classroom practices are insufficient to sustain plaintiff's burden to any reasonable jury.

Moreover, in our view, the cases plaintiff cites from other jurisdictions applying the standard of care " 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances' " offer little guidance to establish that Ford breached his duty of supervision because they are factually distinct from this case. *Dailey*, 87 Cal.Rptr. 376, 470 P.2d at 363. We therefore disagree with plaintiff's argument that "ample" evidence existed on which a reasonable jury could find that Ford breached his duty of supervision because plaintiff did not present any evidence about how an ordinarily prudent teacher would act in the same circumstances. After reviewing the case law from other jurisdictions holding that teachers breached a duty to supervise, it is our opinion that these cases do not support a conclusion that plaintiff established sufficient evidence that a reasonable jury could find that Ford breached his duty.[6]

---

**6.** *Wyke v. Polk County School Board*, 129 F.3d 560, 574 (11th Cir.1997) (holding duty to supervise students includes informing parents about suicide attempts in school); *Roberson v. Duval County School Board*, 618 So.2d 360, 362 (Fla.Dist.Ct.App.1993) (holding jury issue presented as to whether teacher "exercised a reasonable standard of care in supervising the students" when a student punched a classmate in the face after she loudly told him within earshot of the teacher to stop trying to trip her as the class walked back to their classroom after lunch); *Collins v. School Board of Broward County*, 471 So.2d 560, 564–65 (Fla.Dist.Ct.App.1985) (holding duty to supervise breached where substitute teacher, who may have left the class unattended, did not notice a sexual assault of one student by another in the classroom during class time); *Eisel v. Board of Education of Montgomery County*, 324 Md. 376, 597 A.2d 447, 456 (1991) (holding school counselor aware of suicide pact between students had a duty to communicate with parents regarding his knowledge of the pact).

For example, in *Dailey*, 87 Cal.Rptr. 376, 470 P.2d at 362, a case from the Supreme Court of California, a student died after falling and fracturing his skull in the course of "slap box[ing]" with a friend during their free time after the lunch period and before their next class commenced. The event lasted for five to ten minutes, and approximately thirty students gathered to observe. *Id.* The individual in the school department responsible for supervising the area where the injury occurred spent lunch time in the "gym office." *Id.* He was seated "away from the office windows," and a wall blocked his view of the area where the students' boxing match transpired. *Id.* at 363. Further, he did not leave the office nor notice the crowd of students or hear anything unusual. *Id.* The court held that the evidence was such that "a jury could reasonably conclude that [the] employees * * * who were charged with the responsibility of providing supervision failed to exercise due care in performance of this duty." *Id.* at 365. The court reasoned that the evidence supported the holding because the individual "did not station himself in the office in such a fashion as to maximize his ability to observe the students outside, but sat with his back to the window" and did not hear or see the match despite of the fact that it occurred "within a few feet of the gymnasium." *Id.*

Here, however, Ford did not isolate himself in his office like the supervising teacher in *Dailey*, in complete dereliction of the duty to supervise. Rather, Ford actively carried out his obligations when he took attendance and observed his students for signs that they were capable of safely participating in class. Although Ford also did not position himself to "maximize" his view of the lab because his desk was in a position that traded off an improved view of the lab for access to the overhead projector, he still had a partial view of the lab, unlike the supervisor in *Dailey*, who sat with his back to the window and thus had *no* view of the area where the students were. Additionally, Ford heard the just seconds-long altercation occur and was immediately in the laboratory to assist Medeiros, unlike the supervisor in *Dailey* who did not hear the boxing match as it was ongoing for five to ten minutes. When compared with the evidence of breach of the duty to supervise in the cases plaintiff cites to support a conclusion that Ford breached his duty, the legally sufficient evidence presented in favor of the contention that a reasonable jury could find that Ford breached his duty of supervision is lacking. *See also Wyke*, 129 F.3d at 574; *Roberson*, 618 So.2d at 362; *Collins*, 471 So.2d at 565; *Eisel*, 597 A.2d at 456.

■ After viewing the evidence in a light most favorable to the nonmoving party as we must, we hold that there are no factual issues on which reasonable people might draw different conclusions. Accordingly, the plaintiff cannot prevail on a cause of action for negligence and the trial justice's grant of the defendants' motion for judgment as a matter of law was proper.[7]

---

7. The defendants also argued at trial to support their Super. R. Civ. P. 50 motion that the public duty doctrine supported judgment in their favor because the doctrine immunized defendants from any liability. The public-duty doctrine shields government municipalities "from tort liability arising out of discretionary governmental actions that by their nature are not ordinarily performed by private persons." *Morales v. Town of Johnston*, 895 A.2d 721, 730 (R.I.2006) (quoting *Schultz v. Foster–Glocester Regional School District*, 755 A.2d 153, 155 (R.I.2000)). However, there are three exceptions to this liability shield, which impose "limitations on the immunity of government." *Quality Court Condominium Association v. Quality Hill Development Corp.*, 641 A.2d 746, 750 (R.I.1994); *see*

## III

### Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court and remand the papers in this case to that tribunal.

also *Kuzniar v. Keach*, 709 A.2d 1050, 1053 (R.I.1998). Liability may attach "(1) when the governmental entity owes a 'special duty' to the plaintiff, (2) when the alleged act or omission on the part of the governmental entity was egregious, or (3) when the governmental entity engaged in activities normally undertaken by private individuals or corporations." *Schultz*, 755 A.2d at 155 (quoting *Kuzniar*, 709 A.2d at 1053). The plaintiff argues that the public-duty doctrine is inapplicable because he was an "identifiable person" to whom defendants owed a "special duty." The trial justice declined to address the issue. We need not and do not reach this issue because it is our view that plaintiff failed to prove liability in this case.